# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed: August 31, 2010

No. 09-5051

GHALEB NASSAR AL-BIHANI,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01312)

———

On Petition for Rehearing En Banc

———

**BEFORE:** Sentelle, Chief Judge, and Ginsburg, Henderson, Rogers, Tatel, Garland, Brown, Griffith, and Kavanaugh, Circuit Judges.

## **O R D E R**

Appellant's petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon

consideration of the foregoing and the brief of amici curiae, it is

    **ORDERED** that the petition be denied.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Michael C. McGrail
Deputy Clerk

\* A statement by Chief Judge Sentelle and Circuit Judges Ginsburg, Henderson, Rogers, Tatel, Garland, and Griffith, concurring in the denial of rehearing en banc, is attached.

\* A statement by Circuit Judge Brown, concurring in the denial of rehearing en banc, is attached.

\* A statement by Circuit Judge Kavanaugh, concurring in the denial of rehearing en banc, is attached.

\* A statement by Senior Circuit Judge Williams is attached.

SENTELLE, *Chief Judge*, and GINSBURG, HENDERSON, ROGERS, TATEL, GARLAND, and GRIFFITH, *Circuit Judges*, concurring in the denial of rehearing en banc:  We decline to en banc this case to determine the role of international law-of-war principles in interpreting the AUMF because, as the various opinions issued in the case indicate, the panel's discussion of that question is not necessary to the disposition of the merits.  *See Al-Bihani v. Obama*, 590 F.3d 866, 871, 873-74 (D.C. Cir. 2010) (panel opinion); *id.* at 883-85 (Williams, J., concurring in the judgment); *Al-Bihani v. Obama*, No. 09-5051, slip op. at 1 (D.C. Cir. Aug. 31, 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc); *see also* Gov't's Resp. to Pet. for Reh'g and Reh'g En Banc at 1-2 (stating that the dispute over the role of the law of war does not "change[] the outcome").

BROWN, *Circuit Judge*, concurring in the denial of rehearing en banc: Denial is the fate of most requests for en banc review, and almost all requests meet that fate quietly without comment from the court. I would prefer to follow the usual pattern here. But this, it seems, is no usual case. Neither the government's response to the request for rehearing nor the opinions accompanying the denial can be described as "usual." Al-Bihani's petition requests the court take the radical step of incorporating all of international law as judicially enforceable constraints on the President's war powers. The government responds ambivalently, adopting the questionable strategy of conceding Al-Bihani's point, but nonetheless urging denial of rehearing. Seven members of this court now vote to deny the petition, but append a cryptic statement that exhibits no apparent function other than to mystify. One judge offers a scholarly exegesis on the unenforceability of international law norms as limits on the President's war-making authority under the AUMF. And last, another judge contributes a separate opinion that conceives of a brave new role for judges in wartime: that of supervisors of the battlefield.

These are unusual developments, indeed, and their cumulative effect is to muddy the clear holding of *Al-Bihani* that international law as a whole does not limit the AUMF's grant of war powers. Although we have avoided en banc review, we have done so through the costly expedient of making a rather common-place judicial proposition impenetrably obscure. Clarity in law is a virtue. In the context of war, that virtue becomes a life-and-death necessity. But there appears to be a countervailing motivation behind the court's resistance to *Al-Bihani*'s holding: an intuition about the domestic role of international law, one that moves below the surface of the briefs and opinions of this en banc petition process. Hoping to avoid a resolution that leaves all parties in doubt about international law's relation to the AUMF, I write

separately to pull the veil back on that intuition and provide as much clarity as possible.

The *Al-Bihani* opinion held as "mistaken" the "premise that the war powers granted by" the AUMF and other statutes "are limited by the international laws of war." *Al-Bihani v. Obama*, 590 F.3d 866, 871 (D.C. Cir. 2010). This holding disposed of Al-Bihani's international law–based claims and instead hinged the resolution of his case on "the text of relevant statutes and controlling domestic caselaw." *Id.* at 871–72.

Although Al-Bihani's rehearing petition challenges the panel opinion on numerous points, it is his challenge to this holding that has caused consternation. Seven judges have embraced a peculiar concurrence that strives to make clear that the holding was not necessary to the disposition of the case, providing four citations to that effect. But the concurrence leaves unclear the reason why this uncontroversial point is relevant. We grant rehearing when a panel opinion creates a conflict with Supreme Court or circuit precedent, or when a case presents a question we deem exceptionally important. *See* FED. R. APP. P. 35(a). Neither of these criteria is affected when an opinion's disposition is supported by two independently sufficient alternative holdings.

Perhaps the seven-member concurrence is implying that the holding at issue is dictum—a position for which Judge Williams argued explicitly in his separate opinion at the panel stage, *see Al-Bihani*, 590 F.3d at 885 (Williams, J., concurring). Under this view, the holding would therefore be incapable of either creating a conflict with prior law or presenting an important question. But this notion would be incorrect. It is a longstanding principle that alternative

holdings each possess precedential effect. *See United States v. Title Ins. & Trust Co.*, 265 U.S 472, 486 (1924) ("[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other."); *see also Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949); *Commonwealth of Mass. v. United States*, 333 U.S. 611, 623 (1948). Therefore, if the majority of this court believes the holding at issue would otherwise satisfy one or both of the en banc rehearing criteria, a grant of rehearing cannot be avoided by labeling the holding as unnecessary. Nor will future litigants be able to avoid the holding's binding authority by wielding the same label.

Another possible motivation for the concurrence may be a desire to accommodate both the government's eager concession that international law does in fact limit the AUMF and the government's argument that its opinion on the matter is entitled to "substantial deference."[1] Resp. to Petition for Rehearing, at 6–8 & n.3. But such a motivation would be illegitimate. Contrary to the government's claim, its preferred statutory interpretation warrants no deference from this court. A "pure question of statutory construction [is] for the courts to decide," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987), and doing so—even when a statute concerns foreign affairs—is "well within the province of the Judiciary," *Repub. of Austria v. Altmann*, 541 U.S. 677, 701 (2004). Of course, courts are highly deferential when reviewing challenges to

---

[1] Judge Kavanaugh reads this part of the government's brief differently than I do, seeing it as a conflicted argument that leaves doubt over whether the government truly means what it says. *See infra*, at 75–77 (Kavanaugh, J., concurring in denial of en banc rehearing). I agree the government's brief is conflicted as a general matter, but on this point I believe its claim to deference is clear.

4

executive actions taken pursuant to a grant of wide discretion "to affect a situation in a foreign territory." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 321 (1936). We will refrain from requiring "narrowly definite standards by which the President is to be governed" and will not lightly endeavor to "limit[] or embarrass[] such powers." *Id.* at 322.[2] However, even when courts consider the Executive's historic practice to inform the interpretation of a statute, they are not imbuing the President with judicial power.

I sense, then, something more significant than a narrow concern over dictum or deference at work in the seven-member concurrence. There is in the scholarly community an intuition that domestic statutes do not stand on their own authority, but rather rest against the backdrop of international norms. This intuition has taken many argumentative forms, some more emphatic than others. For instance, there are those scholars who believe domestic statutes are merely suggestive wordings to which courts can and should append international legal norms, regardless of congressional intent.[3] Others are more shy, imparting to Congress a general intent to legislate in conformity with international law and therefore reasoning that all statutes, unless containing a clear statement otherwise,

---

[2] This was, in fact, precisely the sort of deference the government received in the panel decision.

[3] *See, e.g.*, Jeremy Waldron, *Foreign Law and the Modern Ius Gentium*, 119 HARV. L. REV. 129, 144 (2005) (proposing courts resort to norms located in a universal "*ius gentium*" to treat "problems that arise in our courts as though they were questions of legal science"); Jonathan Turley, *Dualistic Values in the Age of International Legisprudence*, 44 HASTINGS L.J. 185, 265, 271 (1993) (advocating courts shift "the emphasis away from determining congressional intent toward upholding international principles" and "serve a central political function in the developing transnational arena").

should be read by courts to incorporate international legal norms.[4] However this intuition is phrased, perhaps the majority of judges on this court are apprehensive about unambiguously rejecting it. So, even though the panel decision foreclosed the idea, the short concurrence may represent a wish to leave open a possibility—however slight—that domestic statutes are in fact subordinate to an overarching international legal order.

If that is their wish, it is a curious one. The idea that international norms hang over domestic law as a corrective force to be implemented by courts is not only alien to our caselaw, but an aggrandizement of the judicial role beyond the Constitution's conception of the separation of powers. *See United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("[T]he role of judges . . . is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."). That aggrandizement is clear in the more extreme scholarly opinions calling for courts to ignore congressional intent in favor of international norms. And it is only slightly better disguised in the superficially restrained claims that Congress intends to conform its actions with global ideals, and that a clear statement is required if courts are to be prevented from reading international law into statutory text. Traditional clear statement rules are justified on the basis of preserving statutes against possible nullification by a constitutional value,

---

[4] *See, e.g.*, Ingrid Brunk Wuerth, *Authorizations for the Use of Force, International Law, and the* Charming Betsy *Canon*, 46 B.C. L. REV. 293, 334–36, 357 (2005); Ralph G. Steinhardt, *The Role of International Law as a Canon of Domestic Statutory Construction*, 43 VAND. L. REV. 1103, 1112, 1115 (1990) (positing a "presumption that Congress intends to conform its statutes to international standards" in the "absence of a clear statement of repudiation by Congress").

keeping both Congress and the judiciary within their constitutional capacities.[5]  However, a demand that Congress clearly enunciate the inapplicability of international norms is not premised on any constitutional value; nothing in the Constitution compels the domestic incorporation of international law.  Instead, what such a demand protects is a *policy* preference, imputing to Congress a general posture toward international restrictions and erecting the highest interpretive hurdle to the legitimate prerogative of Congress to legislate apart from them.  This is a restrained search for legislative "intent" only in the most Orwellian sense—one that grants judges license to usurp the legislative role and dictate to Congress what it is supposed to think.  Surprisingly, proponents of this idea actually claim it guards the separation of powers.  *See* Wuerth, *supra*, at 349–50.  But if that is the case, then the cure is truly worse than the disease.

I see much of this scholarly idea in Judge Williams' separate opinion.  While purporting to share Judge Kavanaugh's concern about using "gauzy notions of international law to rein in the executive's conduct of military operations," *infra*, at 7 (opinion of Williams, J.), Judge Williams offers a hazy but ominous hermeneutics.  Its animating premise is that *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), used the Suspension Clause to create an opening through which the Judiciary now—as a *constitutional* matter—"monitor[s]" and "supervise[s] the battlefield conduct of the U.S. military."  *Infra*, at 7–8 (opinion of Williams, J.).  In executing this supervisory role, the Judiciary

---

[5] *See* William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 VAND. L. REV. 593, 599–609 (1992) (discussing the constitutional concerns behind canons such as the constitutional avoidance canon, the rule of lenity, and the presumption in favor of judicial review).

should survey the spectrum of "international discourse," picking and choosing those propositions that exhibit—by the Judiciary's lights—"serious reasoning," "consistent[] and evenhanded[] appli[cation]," and "practical[ity]" to the point where they are suitable to control the President's conduct of war. *Id.* at 2, 7. Judge Williams states these propositions matter-of-factly, even blithely, as routine matters of statutory interpretation. But that nonchalance is only a mask for what is, at its core, a radical and sweeping claim, one at odds with our Constitution and caselaw.

The Constitution entrusts the President—not the Judiciary—with the conduct of war. "The Framers . . . did not make the judiciary the overseer of our government," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring), so *Boumediene* cannot be read—as Judge Williams suggests—to override that basic notion and hand courts authority to deem international norms as binding commands on the Commander-in-Chief. Such a reading would be in tension with the Supreme Court's recognition that courts are "hardly . . . competent" in the realm of foreign affairs, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964), and with the constitutional principle that prohibits even Congress, let alone the Judiciary, from "interfer[ing] with the [Executive's] command of forces and the conduct of campaigns," *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring).

Further, Judge Williams' proposed role for the Judiciary goes far beyond the role the Supreme Court envisioned in *Hamdi v. Rumsfeld* and *Boumediene*. The *Hamdi* plurality forecast a restrained process that "meddles little, if at all, in the strategy or conduct of war, inquiring only into the appropriateness of continuing to detain an individual claimed

to have taken up arms against the United States." 542 U.S. 507, 535 (2004). It seems farfetched that "inquiring *only* into the appropriateness" of detention should be freighted with the awesome power of deciding which international constraints to enforce against the President. In a similar vein, the Court in *Boumediene* was circumspect about crafting any substantive rules to control the President's war powers, repeating that it was not addressing the "content of the law that governs petitioners' detention," leaving it to the political branches first to engage in a "debate about how best to preserve Constitutional values while protecting the Nation from terrorism." 128 S. Ct. at 2277. *Boumediene*'s holding concerned the jurisdiction of U.S. courts over Guantanamo habeas petitions, and it strains the *jurisdictional* nature of that holding to draw from it a *substantive* judicial power to spin international discourse into binding domestic law. It is no wonder then that Judge Williams does not offer any language from *Boumediene* to support his theory of an expanded judicial role in military affairs.

This sprint into judicial immodesty cannot be redeemed by Judge Williams' argument that international law parallels traditional tools of statutory interpretation, and that by turning to it for substantive meaning courts are only divining the intent of Congress. I am unaware of *any* federal judicial opinion—and Judge Williams cites none—that has ever before characterized international discourse as a traditional tool of statutory interpretation on par with legislative history, usage in other domestic statutes and cases, or dictionary definitions. The varied process by which international law is made—through treaty, tribunal decision, and the constant churn of state practice and *opinio juris*—shares few, if any, of the qualities that give the traditional sources of interpretation their authority. Courts turn to legislative history because it comes from the mouths of legislators and therefore arguably

sheds light on their intentions and understandings. Courts examine the usage of terms in other statutes and judicial decisions because our law is a closed and coherent system that strives for internal consistency. And courts consult dictionaries for the same reason most people do: our law, like the rest of our society, is dependent on language's technical meaning among American English speakers. On none of these grounds can the use of international law be justified.

As Judge Kavanaugh explains in his detailed concurrence, international norms outside of those explicitly incorporated into our domestic law by the political branches are not part of the fabric of the law enforceable by federal courts after *Erie*. *See infra*, at 15–21 (Kavanaugh, J., concurring in denial of en banc rehearing). They therefore do not help courts to determine congressional intent or to recognize the wider coherence of the law. And international discourse, unlike a dictionary, is anything but a source of specific, technical, and shared linguistic meaning. Judge Williams concedes this point, characterizing international law as often "vague and deficient," consisting of "gauzy notions" that are prone to "misuse" by nations for "political purpose[s]," and subject to official criticism by our elected representatives. *Infra*, at 7 (opinion of Williams, J.). How can sifting through such an unstable and unreliable trove of meaning be likened to opening a dictionary? How is it advisable or legitimate for courts to take on such a treacherous task, especially when the political branches possess the competency and traditional duty to do the sifting themselves by domestically incorporating international law through statute or rendering treaties self-executing?

But suppose we ignore the questionable propriety of Judge Williams' interpretive method and endeavor to apply it in this case. Ironically—and perhaps paradoxically—we

likely would double-back to the same conclusion that international law does not limit the AUMF.  The phrase in the AUMF on which Al-Bihani hinges his argument is "necessary and appropriate," which he contends modifies the word "force" by prohibiting conduct not approved by international law.  The closest analogy in domestic law is the phrase "necessary and proper," which, as Judge Kavanaugh notes in his concurrence, has in its constitutional and statutory provenance been consistently interpreted to broaden rather than to constrain discretion.  *See, e.g.*, *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 550 (1870) ("[T]he auxiliary powers, those *necessary and appropriate* to the execution of other powers singly described . . . are grouped in the last clause of section eight of the first article [the Necessary and Proper Clause].") (emphasis added).  Turning to international materials does not yield a different meaning.  Usage of the phrase "necessary and appropriate" on the international plane grants nations wide discretion to act and does not purport to constrain them with international law.  One example—among many—is U.N. Security Council Resolution 1624, which in three separate clauses calls upon states "to take all measures as may be necessary and appropriate *and in accordance with their obligations under international law*" to counter incitement to terrorist acts.  S.C. Res. 1624, ¶¶ 1, 3, U.N. Doc. S/RES/1624 (Sept. 14, 2005) (emphasis added); *see also id.* pmbl.  That the Security Council felt the need to append international law obligations to "necessary and appropriate"— three times, no less—indicates the phrase does not automatically incorporate such obligations.

But putting aside the preceding discussion (and the odd conceptual loop it creates), I reiterate that consulting international sources in that manner is not something judges have in their interpretive toolbox.  The only generally applicable role for international law in statutory interpretation

is the modest one afforded by the *Charming Betsy* canon, which counsels courts, where fairly possible, to construe ambiguous statutes so as not to conflict with international law. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 114 (1987); *see also Sampson v. Fed. Repub. of Germany*, 250 F.3d 1145, 1152 (7th Cir. 2001).[6] However, Judge Williams does not appear to confine international law to such a narrow space. By including international discourse among the traditional tools available to courts when interpreting statutes, Judge Williams is not limiting the application of international law to ambiguous statutory text. Generally, a statute's text is only ambiguous if, after "employing traditional tools of statutory construction," a court determines that Congress did not have a precise intention on the question at issue. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). It is at this point—analogous to *Chevron* Step Two— that the *Charming Betsy* canon has had any application in federal courts. But Judge Williams implies that international law should be consulted in the first instance to influence

---

[6] I note the *Charming Betsy* canon was not invoked in the panel opinion because it is not applicable to this case. First, the relevant text of the AUMF is not ambiguous. The phrase "necessary and appropriate" is broad, but wide breadth is not tantamount to ambiguity, particularly when a phrase has a stable interpretive pedigree. Second, even if the phrase were ambiguous, the canon only applies to statutory interpretations that would violate international law. An interpretation declining to place international legal constraints on the President does not, by itself, place the United States in violation of international law. It merely affirms the President's normal prerogative to observe or abrogate international obligations. Judge Kavanaugh also details other persuasive reasons why *Charming Betsy* does not apply in this case. *See infra*, at 45–66 (Kavanaugh, J., concurring in the denial of en banc rehearing).

interpretation at the same level as traditional interpretive tools, making its use predicate to a finding of ambiguity. This implication has the secondary effect of eviscerating the limiting principle of the *Charming Betsy* canon that it only exerts a *negative* force on the meaning of statutes, pushing them away from meanings that would conflict with international law. Courts do not apply *Charming Betsy* as an *affirmative* indicator of statutory meaning. *See, e.g.*, *Sampson*, 250 F.3d at 1152–53 (holding the *Charming Betsy* canon does not require "federal statutes [to be] read to reflect norms of international law"); *Princz v. Fed. Repub. of Germany*, 26 F.3d 1166, 1174 & n.1 (D.C. Cir. 1994) (rejecting dissent's argument that statutes must be read "consistently with international law" and must be presumed to "incorporate[] standards recognized under international law," *Princz*, 26 F.3d at 1183 (Wald, J., dissenting)). However, under Judge Williams' method, I see no reason why courts would be bound by this rule, since traditional interpretive sources are normally viewed as indicative of affirmative meaning. These inconsistencies with the *Charming Betsy* canon make clear that Judge Williams' proposal cannot possibly be correct. If it were, it would be a mystery why American jurisprudence would even bother to enunciate an interpretive canon like the *Charming Betsy*. Judge Williams' approach would make that canon vestigial, foolish even—akin to a canon limiting the use of dictionaries.

Most troubling of all is the grotesque *non sequitur* that Congress must have intended to incorporate international law through the AUMF because it would be odd to think Congress "embrace[d]" a long history of wartime atrocity, from the Rape of Nanking to the massacre at Lidice. Judge Williams may believe that the only barrier that would hold back our nation from a descent into Nazism is an enlightened judiciary standing at the precipice, wielding international norms our

polity is presumably unable to muster from within.[7]  But that belief cannot change the plain text of the AUMF, its legislative history, or the longstanding congressional practice of granting "the President a degree of discretion and freedom from statutory restriction" necessary to carry out his foreign affairs duties, *Curtiss-Wright*, 299 U.S. at 320.

There is no indication that the AUMF placed any international legal limits on the President's discretion to prosecute the war and, in light of the challenge our nation faced after September 11, 2001, that makes eminent sense. Confronted with a shadowy, non-traditional foe that succeeded in bringing a war to our doorstep by asymmetric means, it was (and still is) unclear how international law applies in all respects to this new context.  The prospect is very real that some tradeoffs traditionally struck by the laws of war no longer make sense.  That Congress wished the President to retain the discretion to recalibrate the military's strategy and tactics in light of circumstances not contemplated by our international obligations is therefore sensible, and reflects the traditional sovereign prerogative to violate international law or terminate international agreements. *See Garcia-Mir v. Meese*, 788 F.2d 1446, 1455 (11th Cir. 1986) ("[T]he power of the President to disregard international law in service of domestic needs is reaffirmed."); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 339 (describing power of the President to suspend or terminate international agreements).[8]

---

[7] Our nation has in fact established workable norms forbidding such crimes against humanity, as detailed by Judge Kavanaugh. *See infra*, at 6–7, 39–45 (Kavanaugh, J., concurring in denial of en banc rehearing).

[8] That courts cannot enforce non–self-executing or non-incorporated international law against the President does not imply the United States would escape consequences of breach on the

The only way a court could reach the opposite conclusion is to go beyond the AUMF's text, freeing it—as Judge Williams suggests—to appeal to an international meta-narrative, one activated whenever a legal issue touches on matters that strike the judge as transnational in flavor. Judges act prudently when they consciously forego opportunities for policymaking. Therefore, ignoring the text and plain meaning of a statute to privilege a more creative interpretation is the antithesis of prudence. And, in a time of war, it has the inconvenient effect of upending more than a century of our jurisprudence based on an understanding as old as the Republic: that the "conduct of foreign relations of our government is committed by the Constitution to the executive and legislative . . . departments," not to the judiciary. *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).

The only proper judicial role in this case is the truly modest route taken by the panel opinion in *Al-Bihani*. We read "necessary and appropriate" in its traditional sense, taking Congress at its word that the President is to have wide discretion. This is a modest course because the President retains the leeway to implement his authority as broadly or narrowly as he believes appropriate—consistent with international law or not—and the legislature, in turn, may add whatever limits or constraints it deems wise as the war progresses. This ensures that wartime decisions will be informed by the expertise of the political branches, stated in a clear fashion, and that the decisionmakers will be accountable to the electorate.

---

international plane. Whether to incur such consequences is part of the political calculus the President performs when deciding to disregard international obligations.

None of those benefits accrue if the conduct of the military is subject to judicial correction based on norms of international discourse. Such an approach would place ultimate control of the war in the one branch insulated from both the battlefield and the ballot box. That would add further illegitimacy to the unpredictable and ad hoc rules judges would draw from the primordial stew of treaties, state practice, tribunal decisions, scholarly opinion, and foreign law that swirls beyond our borders. It is no comfort to the military to say, as Judge Williams does, that courts will only apply international rules they deem to possess the qualities of serious reason, evenhandedness, and practicality. Those are not judicially manageable standards. Those are buzzwords, the pleasing sound of which nearly lulls the mind into missing the vision of judicial supremacy at the heart of Judge Williams' opinion.

KAVANAUGH, *Circuit Judge*, concurring in the denial of rehearing en banc:

In the 2001 Authorization for Use of Military Force, Congress authorized the President to wage war against al Qaeda and the Taliban. That war continues. At the President's direction, the U.S. military is detaining Al-Bihani as an enemy belligerent in the ongoing conflict. Al-Bihani has asked this Court to order his release from U.S. military custody. He argues that international-law principles prohibit his continued detention.

The premise of Al-Bihani's plea for release is that international-law norms are judicially enforceable limits on the President's war-making authority under the AUMF. Even accepting that premise, Al-Bihani cannot prevail in this case. As the panel opinion correctly concludes, Al-Bihani's arguments misconstrue international law and overlook controlling federal statutes such as the Military Commissions Acts of 2006 and 2009.

In any event, as the panel opinion also states, the premise of Al-Bihani's argument is incorrect. International-law norms that have not been incorporated into domestic U.S. law by the political branches are not judicially enforceable limits on the President's authority under the AUMF. This separate opinion explains at great length my reasons for reaching that conclusion.

Al-Bihani's invocation of international law raises two fundamental questions. First, are international-law norms automatically part of domestic U.S. law? Second, even if international-law norms are not automatically part of domestic U.S. law, does the 2001 AUMF incorporate international-law principles as judicially enforceable limits on the President's wartime authority under the AUMF? The answer to both questions is no.

*First*, international-law norms are not domestic U.S. law in the absence of action by the political branches to codify those norms. Congress and the President can and often do incorporate international-law principles into domestic U.S. law by way of a statute (or executive regulations issued pursuant to statutory authority) or a self-executing treaty. When that happens, the relevant international-law principles become part of the domestic U.S. law that federal courts must enforce, assuming there is a cognizable cause of action and the prerequisites for federal jurisdiction are satisfied. But in light of the Supreme Court's 1938 decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), which established that there is no federal general common law, international-law norms are not enforceable in federal courts unless the political branches have incorporated the norms into domestic U.S. law. None of the international-law norms cited by Al-Bihani has been so incorporated into domestic U.S. law.

*Second*, the 2001 AUMF does not expressly or impliedly incorporate judicially enforceable international-law limits on the President's direction of the war against al Qaeda and the Taliban. In authorizing the President to employ force, the AUMF authorizes the President to command the U.S. military to kill, capture, and detain the enemy, as Commanders in Chief traditionally have done in waging wars throughout American history. Congress enacted the AUMF with knowledge that the U.S. Constitution and other federal statutes would limit the President's conduct of the war. But neither the AUMF's text nor contemporaneous statements by Members of Congress suggest that Congress intended to impose judicially enforceable *international-law* limits on the President's authority under the AUMF.

Moreover, for three alternative reasons, the *Charming Betsy* canon does not authorize courts to employ international-law norms when interpreting a statute like the AUMF that broadly authorizes the President to wage war against a foreign enemy. To begin with, in the post-*Erie* era, the canon does not permit courts to alter their interpretation of federal statutes based on international-law norms that have not been incorporated into domestic U.S. law. Indeed, since *Erie* was decided, the Supreme Court has applied that canon only to support the presumption that a federal statute does not apply extraterritorially. Even if one disagrees with that initial reason for not applying *Charming Betsy*, however, courts may not invoke the canon against the Executive. Under basic principles of administrative law, the Executive generally has the authority to interpret ambiguous statutes within the bounds of reasonableness and, in so doing, to weigh international-law considerations as much or as little as the Executive sees fit. And even if one also disagrees with that, there is another, still narrower reason why *Charming Betsy* does not apply here: Courts have never applied the *Charming Betsy* canon against the Executive to limit the scope of a congressional authorization of war. For good reason: To the extent there is ambiguity in a statutory grant to the President of war-making authority, the President – not an international tribunal or international law – is to resolve the ambiguity in the first instance. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988); *cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

Al-Bihani relatedly suggests that *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), already held that the AUMF incorporates international-law norms and that courts therefore must enforce international-law limits against the President. That is incorrect: *Hamdi* never stated that the AUMF incorporates judicially enforceable international-law limits on the

President's authority, which of course would have been a momentous and unprecedented holding.

In sum, a federal court lacks legitimate authority to interfere with the American war effort by ordering the President to comply with international-law principles that are not incorporated into statutes, regulations, or self-executing treaties.

Before proceeding to the analysis of these issues, I emphasize three overarching points about the position advanced in this separate opinion.

*First*, this opinion recognizes and reinforces the traditional roles of Congress, the President, and the Judiciary in national-security-related matters – roles enduringly articulated in Justice Jackson's separate opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). Courts enforce constitutionally permissible constraints imposed *by Congress* on the President's war powers. *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Youngstown*, 343 U.S. at 634-655 (Jackson, J., concurring); *see generally* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 761-66 (2008). So, too, courts enforce judicially manageable limits imposed *by the U.S. Constitution* on the President's war powers. *See Boumediene v. Bush*, 128 S. Ct. 2229 (2008); *Hamdi*, 542 U.S. 507. But courts may not interfere with the President's exercise of war powers based on international-law norms that the political branches have not seen fit to enact into domestic U.S. law.

*Second*, the limited authority of *the Judiciary* to rely on international law to restrict the American war effort does not

imply that *the political branches* should ignore or disregard international-law norms. The principles of the international laws of war (and of international law more generally) deserve the respect of the United States. Violating international-law norms and breaching international obligations may trigger serious consequences, such as subjecting the United States to sanctions, undermining U.S. standing in the world community, or encouraging retaliation against U.S. personnel abroad. Therefore, Congress and the President are often well-advised to take account of international-law principles when considering potential legislation or treaties. And even when international-law norms have not been incorporated into domestic U.S. law, the Executive Branch, to the extent permissible under its constitutional and statutory authority, is often wise to pay close attention to those norms as a matter of sound policy, international obligation, or effective foreign relations. *See, e.g.*, Harold Hongju Koh, Legal Adviser, U.S. Department of State, The Obama Administration and International Law: Address at the Annual Meeting of the American Society of International Law (Mar. 25, 2010); John B. Bellinger III, Legal Adviser, U.S. Department of State, Testimony Before the Senate Committee on Foreign Relations (April 15, 2008), *reprinted in part in* DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 2008, at 887-88 (Elizabeth R. Wilcox ed.); Letter from Gen. Colin L. Powell to Sen. John McCain (Sept. 13, 2006), *reprinted at* 152 CONG. REC. S10,412 (daily ed. Sept. 28, 2006).

But in our constitutional system of separated powers, it is for Congress and the President – not the courts – to determine in the first instance whether and how the United States will meet its international obligations. When Congress and the President have chosen not to incorporate international-law norms into domestic U.S. law, bedrock principles of judicial

restraint and separation of powers counsel that courts respect that decision.

*Third*, consistent with that constitutional division of authority, Congress has enacted a significant body of legislation to prohibit certain wartime actions by the Executive and military that contravene American values. For example, Congress has adopted a detailed and extensive Uniform Code of Military Justice, which governs many aspects of military conduct. *See* 10 U.S.C. §§ 801-946. Congress also has passed separate laws banning genocide and war crimes, including laws criminalizing grave breaches of the Geneva Conventions (such as rape, torture, and murder). *See, e.g.*, 18 U.S.C. §§ 1091, 2441. In addition, acting pursuant to congressional authorization, the Executive Branch has promulgated numerous legally binding rules that regulate wartime conduct of the military. *See, e.g.*, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Reg. 190-8, § 1-1(b) (Oct. 1, 1997). Those laws, along with many other statutes and regulations, together constitute a comprehensive body of domestic U.S. laws of war.

In his thoughtful opinion in connection with the denial of rehearing, Judge Williams says that it "would be an odd member of Congress who supposed that in authorizing the use of military force he was embracing uses equivalent to *all* such uses that have ever occurred: think Nanking 1937-38; Katyn 1940; Lidice 1942; My Lai 1968." Williams Op. at 2-3. I agree entirely with Judge Williams on that point, but not because I believe Congress intended for U.S. courts to enforce international-law norms against the Executive. Rather, when Congress authorized war in 2001, it did so knowing that domestic U.S. law already prohibited a variety of improper wartime conduct. Judge Williams' worrisome hypotheticals

are thus already taken care of – by the domestic U.S. laws of war – and do not support his suggestion that the AUMF incorporates international-law norms. Notably, Judge Williams points to no examples of violations of international law that would be contrary to fundamental American values but that are not already independently prohibited by domestic U.S. law. There is a good deal of overlap between the international laws of war and domestic U.S. laws regulating war. When there is divergence, however, Congress and the President – not the courts – have the authority in the first instance to decide whether and how to conform U.S. law to international law.[1]

I

Four categories of law are relevant to this case: federal statutes; self-executing treaties made by the President with the concurrence of two-thirds of the Senate; non-self-executing treaties made by the President with the concurrence of two-thirds of the Senate; and customary international law.[2]

---

[1] As the opinions concurring in the denial of rehearing en banc reveal, this question about the relevance of international law to the AUMF is difficult and intricate. And it is only one of many complicated issues that the courts have had to grapple with in conducting habeas proceedings for Guantanamo detainees. In that regard, it is appropriate here to acknowledge the extraordinary efforts of the District Judges of this Circuit in expeditiously addressing and resolving these important and often novel questions. Even when this Court might disagree with a District Court decision, that disagreement is with respect and appreciation for the dedicated work of the District Court on these matters.

[2] A self-executing treaty is one that "has automatic domestic effect as federal law upon ratification." *Medellín v. Texas*, 552 U.S. 491, 505 n.2 (2008).

Those four categories do not share the same status in U.S. law. As I will explain, statutes and self-executing treaties are domestic U.S. law and thus enforceable in U.S. courts. By contrast, non-self-executing treaties and customary international law are not domestic U.S. law. *See Medellín v. Texas*, 552 U.S. 491 (2008); *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Only when international-law principles are incorporated into a statute or a self-executing treaty do they become domestic U.S. law enforceable in U.S. courts.

In this case, none of the purported international-law principles cited by Al-Bihani has been incorporated into a statute or self-executing treaty. Those principles are therefore not part of the domestic law of the United States and, on their own, do not authorize a U.S. court to order Al-Bihani's release from U.S. military detention.

---

A non-self-executing treaty is one that "does not by itself give rise to domestically enforceable federal law." The domestic effect of such a treaty therefore "depends upon implementing legislation passed by Congress." *Id.*

Customary international law is a kind of international common law; it is a body of rules and principles said to arise informally from the general and consistent practice of nations. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987). Evidence of customary international law includes judgments and opinions of international tribunals, such as the International Court of Justice (whose judges are approved by the U.N. General Assembly and Security Council); judgments and opinions of other nations' judicial tribunals; and scholarly writings. *Id.* § 103.

9

A

In our constitutional system, international-law norms may achieve the status of domestic U.S. law through two mechanisms: incorporation into a statute (or legally binding executive regulation adopted pursuant to a statute) or incorporation into a self-executing treaty.

*First*, international-law norms may be incorporated into legislation approved by a majority in both Houses of Congress and signed by the President (or enacted over a presidential veto, or by operation of the Constitution's ten-day rule). *See* U.S. CONST. art. I, § 7.

The important role Congress plays in this sphere is apparent from the text of the Constitution, which specifically authorizes Congress to "define and punish . . . Offences against the Law of Nations." *Id.* art. I, § 8, cl. 10. The delegates to the Constitutional Convention expressly assigned that power to Congress because, as Gouverneur Morris aptly noted at the Convention, international-law principles are "often too vague and deficient to be a rule" without implementing legislation. 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 615 (Max Farrand ed., rev. ed. 1937); *see also United States v. Smith*, 18 U.S. 153, 159 (1820) (international law "cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations").

Consistent with that constitutionally assigned role, Congress sometimes enacts statutes to codify international-law norms derived from non-self-executing treaties or customary international law, or to fulfill international-law obligations. The Foreign Sovereign Immunities Act of 1976 is a good example of that kind of legislation. The Act

governs federal courts' jurisdiction to entertain suits against foreign nations. *See* 28 U.S.C. §§ 1602-1611. As the Supreme Court has recognized, "one of the primary purposes of the FSIA was to codify . . . extant international law." *Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010). Likewise, the War Crimes Act criminalizes certain conduct – including torture, rape, and hostage-taking – committed in war by or against U.S. nationals or members of the U.S. Armed Forces. The Act provides that this conduct "constitutes a grave breach of common Article 3" of the 1949 Geneva Conventions. *See* 18 U.S.C. § 2441(c)(3), (d)(1). Similarly, the Genocide Convention Implementation Act of 1987 criminalizes participation in genocide and thereby implements a non-self-executing treaty to which the United States is a party. *See id.* §§ 1091-1093; Convention on the Prevention and Punishment of the Crime of Genocide, *adopted* Dec. 9, 1948, S. TREATY DOC. NO. 81-15; *see also Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (Bork, J., in chambers) (Genocide Convention is not self-executing).

Congress also has passed several laws designed to implement certain aspects of the international Convention Against Torture, a non-self-executing treaty to which the United States is a party. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, S. TREATY DOC. NO. 100-20; *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003). For example, the Torture Victim Protection Act of 1991 creates a civil cause of action to recover damages for torture committed by foreign officials, "in part to fulfill the Convention's mandate that ratifying nations take action to ensure that torturers are held legally accountable for their actions." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002); *see* 18 U.S.C. § 1350 note. Likewise, the federal criminal torture statute establishes

criminal penalties for U.S. nationals (and non-U.S. persons present in the United States) who commit or conspire to commit torture outside U.S. territory; that statute fulfills U.S. obligations under Articles 4 and 5 of the Convention. 18 U.S.C. §§ 2340-2340A; *see Renkel v. United States*, 456 F.3d 640, 644 (6th Cir. 2006).[3]

When incorporating international-law norms into domestic U.S. law, Congress sometimes simply enacts statutes that refer generically to "international law" (or some variation thereof) without further defining what international law requires. For example, federal piracy statutes permit the capture and forfeiture of vessels used for, and the imprisonment of individuals who commit, acts of "piracy as defined by the law of nations." 18 U.S.C. § 1651; 33 U.S.C. §§ 384-385; *see Ex parte Quirin*, 317 U.S. 1, 29 (1942). Similarly, Congress has authorized the President to use military force to detain foreign vessels at American ports when such action is permitted "by the law of nations or the treaties of the United States." 22 U.S.C. § 462. It has also empowered the President to impose sanctions on foreign

---

[3] Relatedly, international-law norms also may be incorporated into domestic U.S. law by way of executive regulations that have been adopted pursuant to statutory authorization. For example, Army Regulation 190-8 governs the treatment of enemy prisoners of war and other detainees in the custody of the U.S. Armed Forces. The introduction to that regulation states that it "implements international law, both customary and codified, relating to" military detention, including the 1949 Geneva Conventions. Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Reg. 190-8, § 1-1(b) (Oct. 1, 1997); *see* 10 U.S.C. §§ 121, 3061, 6011, 8061 (authorizing issuance of military regulations). Throughout this opinion, when I refer to domestic U.S. law, the reference includes statutorily authorized executive regulations that have the force of law.

countries that use chemical or biological weapons "in violation of international law." *Id.* §§ 5604-5605. In addition, Article 21 of the Uniform Code of Military Justice allows military commissions to the extent permitted by statute or the "law of war." 10 U.S.C. § 821; *see Hamdan v. Rumsfeld*, 548 U.S. 557, 593 (2006) (Congress "preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions – with the express condition that the President and those under his command comply with the law of war"). Congress likewise has repeatedly directed Executive agencies to comply with "general" or "generally recognized" "principles of international law" when administering statutes that involve activities in international waters. *See, e.g.*, 10 U.S.C. § 113 note (Sunken Military Craft, § 1406(b)) (protection of sunken military vessels); 16 U.S.C. § 1435(a) (management of national marine sanctuaries); 30 U.S.C. § 1421 (issuance of permits for deepwater mining operations); 42 U.S.C. § 9119 (issuance of permits for ocean thermal energy conversion facilities).

*Second*, in addition to being incorporated into a statute (or executive regulation adopted pursuant thereto), international-law principles may become part of domestic U.S. law by means of a self-executing treaty that is made by the President with the concurrence of two-thirds of the Senate. *See* U.S. CONST. art. II, § 2, cl. 2; *Medellín*, 552 U.S. at 505 n.2; *Foster v. Neilson*, 27 U.S. 253, 314 (1829). A self-executing treaty is one that "reflect[s] a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect." *Medellín*, 552 U.S. at 521. By contrast, a treaty is non-self-executing when it "reads like a compact between independent nations that depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Id.* at 508-09

(quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)) (internal quotation marks omitted).

Numerous bilateral treaties – agreements between the United States and one other nation – are self-executing. For example, the United States has entered into many bilateral Friendship, Commerce, and Navigation treaties, which define the civil, property, and commercial rights each treaty country will afford to nationals of the other. Courts have routinely held such treaties to be self-executing. *See Medellín*, 552 U.S. at 521 ("we have held that a number of the 'Friendship, Commerce, and Navigation' Treaties . . . are self-executing"); *Kolovrat v. Oregon*, 366 U.S. 187, 191, 196 (1961) (Treaty of Commerce between United States and Serbia enforceable in U.S. court); *Clark v. Allen*, 331 U.S. 503, 508, 517 (1947) (Treaty of Friendship, Commerce, and Consular Rights between United States and Germany enforceable in U.S. court); *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924) (Treaty of Commerce and Navigation between United States and Japan "operates of itself without the aid of any legislation" and "will be applied and given authoritative effect by the courts"); *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008) (Treaty of Amity, Economic Relations, and Consular Rights between United States and Iran, "like other treaties of its kind, is self-executing").

Similarly, bilateral extradition treaties are ordinarily considered self-executing. *See, e.g.*, *Cheung v. United States*, 213 F.3d 82, 95 (2d Cir. 2000).

Courts have been somewhat more reluctant to find *multilateral* treaties self-executing. *See, e.g.*, Andrea Bianchi, *International Law and U.S. Courts: The Myth of Lohengrin Revisited*, 15 EUR. J. INT'L L. 751, 758 (2004); Curtis A.

Bradley, *International Delegations, the Structural Constitution, and Non-Self-Execution*, 55 STAN. L. REV. 1557, 1588 & n.147 (2003). As one court explained, when a multilateral treaty is ratified by many nations, "some of which do not recognize treaties as self-executing," it is difficult for courts to "ascribe to the language of the treaty any common intent that the treaty should of its own force operate as the domestic law of the ratifying nations." *United States v. Postal*, 589 F.2d 862, 878 (5th Cir. 1979).

However, a multilateral treaty still may be self-executing if its terms indicate that the President and Senate so intended. An example is the Warsaw Convention, a treaty entered into by President Franklin Roosevelt with the concurrence of the U.S. Senate in 1934. It governs the liability of air carriers for passenger injuries and lost cargo. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, *opened for signature* Oct. 12, 1929, 49 Stat. 3000. The Supreme Court has held that "no domestic legislation is required to give the [Warsaw] Convention the force of law in the United States." *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984); *see, e.g.*, *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999); *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 90 (D.C. Cir. 2001). Some other multilateral treaties also have been regarded as self-executing, such as the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, the General Inter-American Convention for Trade Mark and Commercial Protection, and the Vienna Convention on Consular Relations. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 533 (1987); *Bacardi Corp. of America v. Domenech*, 311

15

U.S. 150, 161 (1940); *Gandara v. Bennett*, 528 F.3d 823, 828 (11th Cir. 2008).[4]

B

By contrast, international-law principles found in non-self-executing treaties and customary international law, but not incorporated into statutes or self-executing treaties, are not part of domestic U.S. law.

The Supreme Court has squarely held that non-self-executing treaties "are not domestic law." *Medellín*, 552 U.S. at 505 (quotation omitted). Therefore, "responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to Congress." *Id.* at 525-26.

The Supreme Court has likewise indicated that customary international law is not automatically part of domestic U.S. law. *See Sosa*, 542 U.S. 692. Customary international law is said to arise from the "general and consistent practice of states followed by them from a sense of legal obligation." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) (1987). It is a kind of international common law. It does not result from any of the mechanisms specified in the U.S. Constitution for the creation of U.S. law. For that reason, although norms of customary international

---

[4] To say that a treaty is self-executing does not answer the analytically distinct question whether the treaty confers individually enforceable rights or a private cause of action. *See Medellín*, 552 U.S. at 506 n.3. Thus, a treaty may be self-executing in the sense that it imposes domestic-law obligations on government officials, yet the treaty itself may not provide a civil cause of action or other private remedy for violations of those obligations. *Id.*; *see, e.g.*, *McKesson*, 539 F.3d at 488-89; *Gandara*, 528 F.3d at 827-29.

law may obligate the United States internationally, they are not part of domestic U.S. law. Customary-international-law norms become part of domestic U.S. law only if the norms are incorporated into a statute or self-executing treaty.

To be sure, there was a time when U.S. courts stated that customary international law was "part of our law" so that "where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators." *The Paquete Habana*, 175 U.S. 677, 700 (1900). But that oft-quoted statement reflected the notion, common in the early years of the Nation but now discredited, that international law was part of the general common law that federal courts could apply. *See Sosa*, 542 U.S. at 714-15; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938) (historically, the common law was viewed as "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute") (quotation omitted); Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 HARV. L. REV. 815, 849 (1997) (the "statement in *The Paquete Habana* that CIL [customary international law] was 'part of our law'" was "made under the rubric of general common law" and "did *not* mean that CIL had the status of federal law"); Ernest A. Young, *Sorting Out the Debate over Customary International Law*, 42 VA. J. INT'L L. 365, 393-94 (2002) ("as virtually all participants in the customary law debate agree," before *Erie*, international law "had the status of 'general' law: neither state nor federal"); Bradford R. Clark, *Federal Common Law: A Structural Reinterpretation*, 144 U. PA. L. REV. 1245, 1279-81 & n.169 (1996) (before *Erie*, international law, including the laws governing war, "operated as a set of background rules that courts applied in

the absence of any binding sovereign command to the contrary"); John F. Manning, *Textualism and the Equity of the Statute*, 101 COLUM. L. REV. 1, 99 n.382 (2001) ("Because courts applying the law of nations believed that they were merely implementing a pre-existing body of customary law, this decisionmaking process was not conceived of as lawmaking per se.").

But as decided by the Supreme Court in its landmark *Erie* decision in 1938, the view that federal courts may ascertain and enforce international-law norms as part of the general common law is fundamentally inconsistent with a proper understanding of the role of the Federal Judiciary in our constitutional system. In *Erie*, the Supreme Court famously held that there is no general common law enforceable by federal courts. *Erie*, 304 U.S. at 78. The Court said that "law in the sense in which courts speak of it today does not exist without some definite authority behind it." *Id.* at 79 (quotation omitted).

*Erie* means that, in our constitutional system of separated powers, federal courts may not enforce law that lacks a domestic sovereign source. *Erie* "requires federal courts to identify the sovereign source for every rule of decision," and the "appropriate 'sovereigns' under the U.S. Constitution are the federal government and the states." Bradley & Goldsmith, *Customary International Law*, 110 HARV. L. REV. at 852; *see also* Anthony J. Bellia Jr., *State Courts and the Making of Federal Common Law*, 153 U. PA. L. REV. 825, 891 (2005) ("the rise of positivistic legal thought led courts to conclude that all law . . . must be attributable to a sovereign source"); Louise Weinberg, *The Curious Notion that the Rules of Decision Act Blocks Supreme Federal Common Law*, 83 NW. U. L. REV. 860, 867 (1989) ("post-*Erie* positivism has

cleansed American courts of law lacking an identifiable sovereign source").[5]

Some respected scholars have asserted that even though *Erie* did away with the idea of federal general common law, principles of customary international law may still be recognized as federal common law by federal courts. *See, e.g.*, Harold Hongju Koh, *Is International Law Really State Law?*, 111 HARV. L. REV. 1824, 1835 (1998). But that notion is very difficult to square with *Erie* – as other leading scholars have maintained. Indeed, "[c]ourts and scholars generally agree that federal common law must be authorized in some fashion by the Constitution or a federal statute." Bradley & Goldsmith, *Customary International Law*, 110 HARV. L. REV. at 856; *see also* Martha A. Field, *Sources of Law: The Scope*

---

[5] Amici cite several cases in which, they say, "the Supreme Court has relied upon the laws of war as default rules governing the conduct of hostilities, applicable absent explicit statutory language to the contrary." Br. for Non-Governmental Orgs. & Scholars as Amici Curiae in Supp. of Reh'g or Reh'g En Banc at 4-5. With one exception, the cases cited date from the pre-*Erie* era when international-law norms were regarded as part of the general common law discoverable and enforceable by federal courts. Those cases are not controlling after *Erie*. *Cf.* Daniel J. Freeman, *The Canons of War*, 117 YALE L.J. 280, 319 (2007) ("[A]s domestic perception of international law has evolved from being 'part of our law' to a patchwork of ambitious declarations and treaties riddled with reservations, courts ceased to constrain the breadth of AUMFs by reference to international law. . . . [A]voidance of international law – independent of domestic implementation – has not affected interpretation of an AUMF in a hundred years."). Only one cited case – *Ex parte Quirin* – post-dates *Erie*. And *Quirin* supports, rather than undermines, the framework outlined in this opinion. That case involved two *statutes* (Articles of War 12 and 15) that expressly referenced and thereby incorporated the "law of war." *See* 317 U.S. at 27.

*of Federal Common Law*, 99 HARV. L. REV. 881, 887 (1986) (a court "must point to a federal enactment, constitutional or statutory, that it interprets as authorizing the federal common law rule"); Henry J. Friendly, *In Praise of* Erie – *and of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 407 (1964) (federal common law limited to "areas where Congress, acting within powers granted to it, has manifested, be it ever so lightly, an intention to that end").

In light of *Erie*, it follows that "the wholesale incorporation of customary international law as federal common law . . . . offends constitutional norms of federalism, separation of powers, and democracy," because such incorporation would "allow courts to recognize federal norms that do not derive from any of the lawmaking procedures specified by the Constitution." Young, *Sorting Out the Debate*, 42 VA. J. INT'L L. at 462.[6]

In any event, no matter how one might previously have approached the debate about the post-*Erie* status of customary international law, the Supreme Court's 2004 decision in *Sosa* resolved it. *See* 542 U.S. 692. The Court rejected the notion

---

[6] The Supreme Court has recognized that federal courts retain authority post-*Erie* to craft and apply what is sometimes referred to as "federal common law" in those areas in which courts have "express congressional authorization to devise a body of law," as well as a few "interstitial areas of particular federal interest." *Sosa*, 542 U.S. at 726; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-06 (1988). For example, Federal Rule of Evidence 501 expressly authorizes federal courts to recognize evidentiary privileges according to "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." *See, e.g.*, *Univ. of Penn. v. EEOC*, 493 U.S. 182, 188-89 (1990).

that all customary-international-law norms are independently enforceable in federal court. *See id.* at 728. The Court decided that, post-*Erie*, federal courts could recognize claims under the Alien Tort Statute for violation of a narrowly defined subset of international-law norms – not on the theory that international law is automatically incorporated into U.S. law, but rather only to give effect to the congressional intent underlying the ATS's grant of jurisdiction in 1789. *See id.* at 724, 729-30, 731 n.19, 732.

*Sosa* thus confirmed that international-law principles are not automatically part of domestic U.S. law and that those principles can enter into domestic U.S. law only through an affirmative act of the political branches. After all, if customary international law is automatically federal law, then the ATS "ought to cover all CIL claims, so long as they also qualify as torts. But *Sosa* rejected this view" and instead "gave domestic legal force to an extremely limited subset of CIL claims . . . based on its reading of the specific intent of Congress." Ernest A. Young, Sosa *and the Retail Incorporation of International Law*, 120 HARV. L. REV. F. 28, 29 (2007). The *Sosa* Court mandated, in other words, "that any federal common law relating to CIL be grounded in, conform to, and not exceed the contours of what the political branches have authorized." Curtis A. Bradley, Jack L. Goldsmith & David H. Moore, Sosa*, Customary International Law, and the Continuing Relevance of* Erie, 120 HARV. L. REV. 869, 902 (2007). The Court's insistence on that point "simply cannot be reconciled" with the position that "all of CIL is automatically part of judge-made federal common law even in the absence of political branch authorization." *Id.* *Sosa* therefore "would seem to preclude binding the President to CIL as a matter of domestic law in the absence of an incorporating statute or treaty." *Id.* at 930-31; *cf. In re XE Servs. Alien Tort Litigation*, 665 F. Supp. 2d 569, 579 (E.D.

Va. 2009) ("It is clear, then, that *Sosa* does not incorporate customary international law . . . into the body of federal common law in a wholesale manner.").

C

Al-Bihani cites various international-law norms to challenge his detention. But Al-Bihani does not invoke any principles that are actually part of domestic U.S. law enforceable in U.S. courts. He cites no controlling statutes (or executive regulations) or self-executing treaties to support his arguments.

Al-Bihani points to a number of purported international-law principles: (i) that military detention must terminate at the conclusion of the specific conflict of capture; (ii) that the capturing government must either afford a detainee prisoner-of-war status or have the detainee's status determined by a competent tribunal; (iii) that an individual who is not a member of a nation's armed forces (including one who takes up arms as part of a volunteer militia) remains a civilian; (iv) that military force, including detention, cannot be used against civilians unless and until they engage in activities constituting "direct participation in hostilities"; and (v) that a party cannot become a co-belligerent in a particular international armed conflict unless the party has notice of the conflict and violates a duty of neutrality with respect to that conflict.

Based on these and other international-law principles, Al-Bihani also contends, among other things, that *supporters* of al Qaeda or the Taliban cannot be detained unless they engage in activities constituting "direct participation" in hostilities.

The sources on which Al-Bihani relies for those international-law arguments fall into two distinct categories.

First, Al-Bihani cites two treaties to which the United States is a party: the Third and Fourth Geneva Conventions of 1949, which were made by President Truman in 1949 and concurred in by the Senate in 1955. These Conventions were multilateral treaties made in 1949, originally signed by about 60 nations, and later joined by almost all nations. Second, Al-Bihani cites a variety of other international-law sources: the 1977 Additional Protocols to the Geneva Conventions (which were signed by the United States under President Carter but never concurred in by the Senate), commentary from the International Committee of the Red Cross, and the writings of various international-law scholars.

None of the sources on which Al-Bihani relies is part of domestic U.S. law.

Al-Bihani cannot invoke the 1949 Geneva Conventions as a source of domestic U.S. law enforceable in federal court for either of two alternative reasons.

To begin with, the 1949 Geneva Conventions are not self-executing treaties and thus are not domestic U.S. law. To reiterate, a self-executing treaty is one whose terms "reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect." *Medellín*, 552 U.S. at 521. A treaty is non-self-executing when it "reads like a compact between independent nations that depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Id.* at 508-09 (quoting *Head Money Cases*, 112 U.S. at 598) (internal quotation marks omitted).

Under that test, the 1949 Geneva Conventions are non-self-executing treaties. Common Article 1 of the 1949 Geneva Conventions provides: "The High Contracting Parties

undertake to respect and to ensure respect for the present Convention in all circumstances." That language is very similar to the language found in Article 94 of the United Nations Charter, which the Supreme Court recently held to be non-self-executing. Article 94 provides: "Each Member of the United Nations *undertakes to comply* with the decision of the International Court of Justice in any case to which it is a party." U.N. Charter art. 94, para. 1 (emphasis added). In *Medellín*, the Supreme Court concluded that use of the phrase "undertakes to comply" – rather than "'shall' or 'must' comply" – indicated that "further action to give effect to an ICJ judgment was contemplated" and therefore that the treaty did not "vest ICJ decisions with immediate legal effect in domestic courts." 552 U.S. at 508-09 & n.5. For that reason, the *Medellín* Court determined that Article 94 of the U.N. Charter was non-self-executing.

Under the *Medellín* analysis, the 1949 Geneva Conventions' use of "undertake to respect," rather than "shall" or "must" respect, likewise means that "further action . . . was contemplated" to give the Conventions domestic effect. *Id.* at 509 n.5. Like Article 94, therefore, the 1949 Geneva Conventions are not self-executing.

Precedent confirms that the 1949 Geneva Conventions are non-self-executing. In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Supreme Court analyzed the 1929 version of the Third Geneva Convention. The Court recognized that although the Convention granted certain rights to captured alien enemies in wartime, its "obvious scheme" was that those rights depended for their enforcement on "political and military authorities" and that they could be "vindicated . . . only through protests and intervention of" the national governments that were parties to the Convention – in other words, that the 1929 Geneva Convention was non-self-

executing.  *Id.* at 789 n.14; *see also Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C. Cir. 1972) (*Eisentrager* found the "corrective machinery specified in" the 1929 Convention to be "nonjudicial").

The Supreme Court's description of the 1929 Convention also accurately characterizes the text of the 1949 Geneva Conventions and supports the conclusion that the 1949 Conventions are non-self-executing.  Indeed, our Court previously ruled as much in an opinion that is not precedential but is nonetheless persuasive on this point.  *See Hamdan v. Rumsfeld*, 415 F.3d 33, 39 (D.C. Cir. 2005) ("There are differences, but none of them renders *Eisentrager*'s conclusion about the 1929 Convention inapplicable to the 1949 Convention."), *rev'd on other grounds*, 548 U.S. 557 (2006); *see also Hamdi v. Rumsfeld*, 316 F.3d 450, 468 (4th Cir. 2003) ("what discussion there is of enforcement [in the 1949 Geneva Conventions] focuses entirely on the vindication by diplomatic means of treaty rights inhering in sovereign nations"), *vacated and remanded on other grounds*, 542 U.S. 507 (2004).

In sum, although the 1949 Geneva Conventions "create[] an international law obligation on the part of the United States," they do not of their "own force constitute binding federal law."  *Cf. Medellín*, 552 U.S. at 522.  The political branches may incorporate principles found in the Geneva Conventions into domestic U.S. law, as they have done on various occasions.  *See, e.g.*, 18 U.S.C. § 2441 (prohibiting grave breaches of the 1949 Geneva Conventions such as rape, torture, and murder).  So, too, the Executive Branch, acting within the bounds of its statutory and constitutional authority, may adhere to the Geneva Conventions as a matter of international obligation or policy.  But because the

Conventions are not self-executing, a court cannot compel compliance with the Geneva Conventions in this context.

But even assuming arguendo that the 1949 Geneva Conventions were self-executing as written and ratified, Congress has since unambiguously repudiated whatever domestic legal effect the Conventions otherwise might have had in this habeas setting. Section 5(a) of the Military Commissions Act of 2006 – a provision that was left intact by the Military Commissions Act of 2009 – provides in broad and plain terms: "No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States." Pub. L. No. 109-366, § 5(a), 120 Stat. 2600, 2631. The decision by the United States to repudiate any judicially enforceable effect of the 1949 Geneva Conventions in this context resulted from the considered judgment of two Congresses and two Presidents – as reflected in the original 2006 Act and in the 2009 determination not to disturb that provision of the 2006 Act.

A statute can repeal a self-executing treaty (or the domestic force of a self-executing treaty), just as a statute can repeal a prior statute. *See Medellín*, 552 U.S. at 509 n.5; *Breard v. Greene*, 523 U.S. 371, 376 (1998). Consistent with that principle, § 5(a) of the 2006 Military Commissions Act has "superseded whatever domestic effect the Geneva Conventions may have had in actions such as this." *Noriega v. Pastrana*, 564 F.3d 1290, 1296 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 1002 (2010). A habeas court may not invoke the Geneva Conventions against the Executive. As the panel opinion in this case concluded, the plain text of the

Military Commissions Act thus precludes Al-Bihani from relying on the Geneva Conventions in this habeas context.

In a footnote in his rehearing petition, Al-Bihani says that § 5(a) of the Military Commissions Act of 2006 "does not apply to his petition, both as a matter of statutory language and general retroactivity principles" and that applying it "would violate the Suspension Clause." Al-Bihani Pet. for Reh'g and Reh'g En Banc at 7 n.5. Those arguments have no merit.

Al-Bihani's assertion that § 5(a) does not apply to his petition "as a matter of statutory language" is incorrect. As already explained, the "statutory language" of § 5(a) plainly eliminates any domestic effect the Geneva Conventions might have had in habeas cases, as the Eleventh Circuit correctly held. *See Noriega*, 564 F.3d at 1296. In other words, to the extent the Conventions were once self-executing, "Congress has effectively unexecuted [them]," at least for habeas matters of this kind. Curtis A. Bradley, *The Military Commissions Act, Habeas Corpus, and the Geneva Conventions*, 101 AM. J. INT'L L. 322, 341 (2007).

Nor does applying § 5(a) to this dispute pose a retroactivity problem. The relief Al-Bihani seeks is purely prospective. He asks that we order his release from military custody on the ground that his continued, future detention would be unlawful. "When [an] intervening statute . . . affects the propriety of prospective relief, application of the new provision is not retroactive." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994); *see also id.* at 293 (Scalia, J., concurring in judgment) ("Since the purpose of prospective relief is to affect the future rather than remedy the past, the relevant time for judging its retroactivity is the very moment at which it is ordered."). Whether § 5(a) would

apply retroactively to a civil case in which a plaintiff sought damages for injuries predating enactment of the 2006 MCA is a question we need not address here.

Al-Bihani's Suspension Clause argument is likewise meritless. Section 5(a) does not implicate the Suspension Clause because it does not suspend the jurisdiction of the federal courts to hear habeas challenges by detainees such as Al-Bihani. Rather, by repealing the domestic effect of the Geneva Conventions in this context, § 5(a) simply addresses the substantive law that courts may apply to resolve habeas petitions. *See Noriega*, 564 F.3d at 1294 (§ 5(a) does not bar petitioners "from seeking habeas relief," but merely "changes one substantive provision of law upon which a party might rely in seeking habeas relief"); *cf. INS v. St. Cyr*, 533 U.S. 289 (2001).

Apart from the 1949 Geneva Conventions, Al-Bihani does not rely on any treaties (either self-executing or non-self-executing) that have been made by the U.S. President with the concurrence of two-thirds of the U.S. Senate. The other international-law sources he cites – the 1977 Additional Protocols to the Geneva Conventions, Red Cross commentaries, and writings of international-law scholars – may reflect or give rise to principles of customary international law. And those customary-international-law principles may in turn impose obligations on (or raise policy considerations for) the United States in its international relations. The political branches thus may decide to adhere to those international-law norms. But absent incorporation into a statute or a self-executing treaty, such customary-

international-law principles are not part of the domestic law of the United States that is enforceable in federal court.[7]

* * *

To sum up where we are so far: International-law principles are not automatically part of domestic U.S. law enforceable in federal courts. Congress and the President may incorporate international-law principles into domestic U.S. law via a statute (or binding executive regulation) or a self-executing treaty; and when they do so, federal courts will afford that statute or self-executing treaty the full respect

---

[7] Even if international law were a judicially enforceable constraint on the President's authority under the AUMF and even if international law prohibited detention of mere supporters of al Qaeda, Al-Bihani's argument that al Qaeda supporters cannot be detained would be unavailing. An enemy belligerent may be detained for the duration of these hostilities. *See Hamdi*, 542 U.S. at 518 (plurality opinion of O'Connor, J.) (interpreting scope of AUMF's detention authority). And in the Military Commissions Act of 2006 and the Military Commissions Act of 2009, Congress provided that the category of enemy belligerents includes those who "purposefully and materially supported hostilities against the United States or its coalition partners." *See* MCA of 2006 sec. 3(a)(1), § 948a(1)(A)(i), 120 Stat. at 2601; MCA of 2009, Pub. L. No. 111-84, tit. 18, sec. 1802, § 948a(7)(B), 123 Stat. 2574, 2575 (codified at 10 U.S.C. § 948a(7)(B)). A statute may of course override pre-existing statutes, including any statutes that incorporate international law. Therefore, as the panel opinion explained, the Military Commissions Act definitively establishes that those who purposefully and materially support al Qaeda may be detained for the duration of the hostilities, regardless of what international law might otherwise say about detention of such supporters. *See Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010); *contra Hamlily v. Obama*, 616 F. Supp. 2d 63, 76 (D.D.C. 2009).

ordinarily due to federal statutes. But international-law norms that are not incorporated into either a statute or a self-executing treaty – including norms reflected in the 1949 Geneva Conventions and the other international-law sources relied on by Al-Bihani – do not have the status of domestic U.S. law enforceable in federal courts.

## II

Even though none of the international-law sources Al-Bihani relies on is part of domestic U.S. law, Al-Bihani and amici alternatively argue that courts must nonetheless apply international-law principles in resolving cases under the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224. In particular, Al-Bihani and amici contend that we should interpret the AUMF as incorporating international-law principles that limit the President's authority under the AUMF to wage war against al Qaeda and the Taliban.

On its face, this is a radical argument. Al-Bihani and amici would have the Federal Judiciary limit the scope of the President's war-making authority – *not* based on the Constitution and *not* based on express language in a statute or self-executing treaty, but rather based on international-law norms that have never been enacted into domestic U.S. law by American lawmakers.

For the reasons set forth at length below, the argument advanced by Al-Bihani and amici lacks merit: Congress has broadly authorized the President to wage war against al Qaeda and the Taliban. Neither the AUMF's text nor its legislative history suggests that Congress intended international-law principles to limit the scope of that congressional authorization. Congress often incorporates international-law principles into federal law; it did not do so here. Courts must

respect that decision.  Congress has also enacted a vast body of domestic U.S. laws of war.  But Congress has provided no indication that it wants courts to freelance and go beyond Congress's direction by imposing international-law limits on the Executive.  Moreover, the *Charming Betsy* canon of statutory construction does not authorize courts to read international-law limitations into the authority granted to the President by the AUMF.  The Supreme Court's decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), similarly does not support Al-Bihani's submission.

A

Interpretation of a statute begins (and often ends) with its text.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567-68 (2005); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

The text of the 2001 AUMF provides in broad terms:

[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

§ 2(a), 115 Stat. at 224.

The AUMF specifies the enemies against whom the President is authorized to use force – namely, those nations,

organizations, or persons the President deems to have sufficient connection to the September 11th attacks.[8] The AUMF affords the President broad discretion with respect to methods of force, use of military resources, timing, and choice of targets – except, of course, to the extent the U.S. Constitution or other federal statutes or self-executing treaties independently limit the President. In those respects, the AUMF resembles several prior American war declarations and authorizations, such as those during World War II. *See, e.g.*, Joint Resolution of Dec. 8, 1941, ch. 561, 55 Stat. 795 ("the President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial Government of Japan"); Joint Resolution of Dec. 11, 1941, ch. 564, 55 Stat. 796 (same language, substituting "Government of Germany"); *see also* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 HARV. L. REV. 2047, 2083 (2005) (the 2001 AUMF "is as broad as authorizations in declared wars with respect to the resources and methods it authorizes the President to employ, and with respect to the purposes for which these resources can be used").[9]

---

[8] Under the language of the AUMF, al Qaeda is a permissible target for the use of military force because President Bush determined that al Qaeda had planned and committed the September 11th attacks. Similarly, the Taliban is a permissible target under the AUMF because President Bush determined that the Taliban had harbored al Qaeda in Afghanistan.

[9] The 2001 AUMF is broader than certain other force authorizations that have limited the scope of authorized presidential action by regulating the method of force, controlling the use of military resources, setting limits on the timing, or dictating or limiting the choice of targets. For example, in November 1993, Congress authorized the President to use the U.S. Armed Forces in Somalia, but only through March 1994 and only for two specific,

There is no indication in the text of the AUMF that Congress intended to impose judicially enforceable international-law limits on the President's war-making authority under the AUMF. As explained in Part I of this opinion, Congress has enacted many statutes – including war-related statutes – that expressly refer to international law. But unlike those statutes, the AUMF contains no reference to international law. That omission is critically important here because, as the Supreme Court has recognized, "Congress knows how to accord domestic effect to international obligations when it desires such a result." *Medellín v. Texas*, 552 U.S. 491, 522 (2008). Congress did not do so in the AUMF. So too, in enacting the general War Powers Resolution, Congress did not require the President to comply with all facets of international law when commanding and directing U.S. war efforts. *See* 50 U.S.C. §§ 1541-1548.[10]

The silence strongly suggests that Congress did not intend to impose judicially enforceable international-law

---

limited purposes – protecting "United States personnel and bases" and "securing open lines of communication for the free flow of supplies and relief operations." Department of Defense Appropriations Act, 1994, Pub. L. No. 103-139, § 8151(b), 107 Stat. 1418, 1475-77 (1993).

[10] Thus, Al-Bihani's argument that the President's detention authority under the AUMF "derives from" international law is wrong. Al-Bihani Opening Br. at 38. The President's detention authority under the AUMF derives from the text of the statute. Even in the absence of specific congressional authorization, moreover, the President's authority to detain at least non-citizen enemies captured abroad also independently derives from Article II of the Constitution, as explained below in Part III of this opinion.

constraints on the President's war-making authority, including on his detention authority.[11]

---

[11] Some have suggested that Congress's use of the phrase "all necessary and appropriate force" in the AUMF signaled an implicit intent to bind the President to international-law norms, apparently on the theory that any act in violation of those norms would not be "appropriate." *See, e.g.*, JORDAN J. PAUST, BEYOND THE LAW: THE BUSH ADMINISTRATION'S UNLAWFUL RESPONSES IN THE "WAR" ON TERROR 92 (2007); Ingrid Brunk Wuerth, *Authorizations for the Use of Force, International Law, and the* Charming Betsy *Canon*, 46 B.C. L. REV. 293, 325-26 (2005). That interpretation is fundamentally at odds with how that and similar phrases have been understood in American law.

For example, the U.S. Constitution endows Congress with power to "make all Laws which shall be necessary and proper for carrying into Execution" the "Powers vested by this Constitution in the Government of the United States." Art. I, § 8, cl. 18. For nearly two centuries, the Supreme Court has interpreted the Necessary and Proper Clause as giving Congress "broad power to enact laws" that need only be "rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010); *see McCulloch v. Maryland*, 17 U.S. 316, 420-21 (1819).

Moreover, in the field of federal administrative law, Congress has enacted numerous statutes authorizing agency action that is "necessary and appropriate" to a certain end. *See, e.g.*, 7 U.S.C. § 2(a)(1)(E)(i) (CTFC and SEC may issue certain "necessary and appropriate" rules); 14 U.S.C. § 182(a) (Secretary of Homeland Security "shall take such action as may be necessary and appropriate to insure that" the Coast Guard does not discriminate against women); 16 U.S.C. § 1382(a) (Secretary of Commerce shall prescribe certain "necessary and appropriate" regulations). Courts generally have interpreted such language as granting agencies significant discretion. *See, e.g.*, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 976-77 (9th Cir. 2003); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1128 (6th Cir. 1996).

Rather, in ascertaining what the AUMF authorizes, courts presume that Congress authorized the President, except to the extent otherwise prohibited by the Constitution or statutes, to take at least those actions that U.S. Presidents historically have taken in wartime – including killing, capturing, and detaining the enemy. *See Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (when an Executive practice is "known to and acquiesced in by Congress" over an extended period, "Congress may be considered to have consented to the President's action") (quotation omitted); *Haig v. Agee*, 453 U.S. 280, 293-303 (1981) (finding "congressional acquiescence" in longstanding Executive practice of withholding passports for national security reasons); *United*

---

In light of this deeply rooted interpretive tradition, the words "necessary and appropriate" in the AUMF – far from suggesting a significant limitation on the President's war powers – are more naturally read as emphasizing the breadth of the authorization. *See* Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2081 ("It seems unlikely that Congress, which views the Necessary and Proper Clause expansively, and has the most to gain from a broad interpretation of the clause, would have used the phrase 'necessary and appropriate' as a way to constrain presidential authority."); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (Congress legislates against the background of how certain language has previously been interpreted by the other branches of government); *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (same).

In any event, even if there were some reason to think that Congress intended the words "necessary and appropriate" to operate as a significant limit on the President's discretion, there is zero reason to conclude that Congress intended for *international-law norms* to define the term "appropriate." It is much more plausible to think that Congress intended to underscore that the President must operate within the confines of other U.S. laws passed by Congress. *See infra* Part II.C.

*States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915) ("the long-continued practice [of the President], known to and acquiesced in by Congress, would raise a presumption . . . of its consent"); *id.* at 473 ("in determining the meaning of a statute . . . weight shall be given to the usage itself").

B

Even assuming arguendo that the text of the AUMF is ambiguous on this point – which it is not – the statute's legislative history provides no hint that Congress intended to impose judicially enforceable international-law limitations on the President's war-making authority, or on his lesser-included detention authority. *Cf. Allapattah Servs.*, 545 U.S. at 568 (legislative history matters at most to the extent it sheds "a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms"). On the contrary, the House and Senate debates on the AUMF, although necessarily brief given the urgent timing, contain numerous statements indicating that Members of Congress meant to grant the President broad authority in waging a congressionally approved war. For example:

- "[T]he resolution before us . . . . gives the President flexibility as Commander in Chief to conduct military operations as he sees fit." 147 CONG. REC. 17,116 (2001) (statement of Rep. Hinojosa).

- "[W]e are giving the President the power to conduct a war." *Id.* (statement of Rep. Hunter).

- "[A]s the Commander in Chief, he should and does have the power to put our American force to the best use possible across the world." *Id.* at 17,129 (statement of Rep. Gekas).

- "Under our Constitution, the President of the United States is commander in chief. When America is attacked, he assumes the obligations of the commander in chief." *Id.* at 17,138 (statement of Rep. Lofgren).

- "The resolution . . . reinforces and supports the powers granted to the President in the Constitution as Commander in Chief." *Id.* at 17,145 (statement of Rep. Levin).

- "This resolution gives the President the power to conduct a war without reporting to or consulting with Congress." *Id.* at 17,151 (statement of Rep. Stark).

- "Let us give our Commander in Chief all necessary authority to put power behind our purpose . . . ." *Id.* at 17,041 (statement of Sen. McCain).

- "The [AUMF] permits the President wide latitude to use force against the broad range of actors who were responsible for the September 11 attacks." *Id.* at 17,047 (statement of Sen. Biden).

These statements and others like them reinforce the AUMF's plain text and do not indicate that Congress intended to incorporate international-law principles as judicially enforceable limitations on the President's wartime authority.[12]

---

[12] A statement by Representative Clayton of North Carolina has occasionally been cited as evidence that Congress meant to impose international-law limits on the President's authority under the AUMF. Such reliance is mistaken. Representative Clayton stated: "The authorization we give the President today is not

In striking contrast to the lack of references to *international law* in the congressional debates on the AUMF, many in Congress did express their intent that the President act in accordance with *the Constitution* and extant and future-enacted *U.S. statutes*. For example:

- "America is based on a Constitution and our laws. . . . Nothing in the resolution supersedes any requirement of the War Powers Act." *Id.* at 17,123 (statement of Rep. DeFazio).

- "We must carry out military action within the parameters of the Constitution and the War Powers Act, as this resolution provides." *Id.* at 17,125 (statement of Rep. Price).

- "I'm not willing to give President Bush carte blanche authority to fight terrorism. We need to agree to fight it together within traditional constitutional boundaries." *Id.* at 17,148 (statement of Rep. Jackson).

---

unlimited. Congress will monitor progress of our military actions and work with the President to ensure that our actions under this resolution are necessary and appropriate, consistent with our values, in conjunction with our friends and allies, and in accordance with international laws." 147 CONG. REC. 17,146. Representative Clayton's statement on its face reflects only a desire for Congress to "work with the President" in the future to ensure compliance with international law; it did not in any way suggest that the authority granted in the AUMF was subject to judicially enforceable international-law limits. And no other statement in the legislative record suggested that Members of Congress intended the AUMF to incorporate judicially enforceable international-law limits.

- "I want those responsible for these heinous crimes to be hunted down and held accountable – in full compliance with our Constitution and our laws." *Id.* at 17,150 (statement of Rep. McGovern).

- "This joint resolution is based upon and is an exercise of the Congress' constitutional war powers role as codified in the War Powers Resolution. It also expressly confirms the conditions on the exercise of Executive power under that resolution." *Id.* at 17,040 (statement of Sen. Levin).

- "[W]e must act within the confines of the Constitution and the law. I believe that the resolution before us achieves that goal. . . . When we abide by our Constitution and our law, we are as strong as we possibly can be, and we are far stronger than the malevolent force that we soon will engage." *Id.* at 17,041-43 (statement of Sen. Feingold).

The legislative debates preceding passage of the AUMF show that Congress intended the President to comply with the Constitution and domestic U.S. law when waging war. But the debates offer "no suggestion that Congress intended to impose affirmative CIL [customary international law] constraints on the President, much less judicially enforceable CIL constraints." Curtis A. Bradley, Jack L. Goldsmith & David H. Moore, Sosa*, Customary International Law, and the Continuing Relevance of* Erie, 120 HARV. L. REV. 869, 931 (2007).

## C

As was noted in the legislative debates before passage of the 2001 AUMF, Congress has enacted a considerable amount of legislation limiting wartime actions by the Executive and military. This comprehensive set of domestic U.S. laws of war demonstrates that Congress knows how to control wartime conduct by the Executive Branch. And it underscores the illegitimacy of courts' unilaterally restraining the Executive's war effort with additional international-law restrictions that Congress and the President have not seen fit to enact into domestic U.S. law.

When Congress passed the AUMF in 2001, it did so against the background of an expansive body of domestic U.S. law prohibiting wartime actions by the Executive that contravene American values. For example, in the War Crimes Act, Congress criminalized various wartime atrocities constituting "grave breaches" of Common Article 3 of the 1949 Geneva Conventions. Congress subsequently clarified that such breaches include murder (defined as killing a person "taking no active part in the hostilities"), torture, biological experimentation, mutilation, rape, and hostage-taking. 18 U.S.C. § 2441(c)(3), (d)(1). Another criminal statute separately prohibits the commission of torture outside of U.S. territory, including by members of the U.S. military. *Id.* § 2340A. Likewise, in the Genocide Convention Implementation Act, Congress criminalized acts of genocide intended to "destroy, in whole or in substantial part, a national, ethnic, racial, or religious group." *Id.* § 1091(a).

These kinds of laws are not a new phenomenon. Since early in the Nation's history, Congress has enacted legislation governing the conduct of the Executive and the military in war. In 1800, Congress passed the Articles for the

Government of the Navy, prohibiting (among other things) murder, theft, plunder, mistreatment of the crew of a captured vessel, and mistreatment of inhabitants of a port. *See* Act of Apr. 23, 1800, ch. 33, § 1, arts. 9, 21, 26-27, 2 Stat. 45, 46, 48. In 1806, Congress enacted the Articles of War to govern the U.S. Army, prohibiting (among other things) violence against civilians and malicious destruction of private property. *See* Act of Apr. 10, 1806, ch. 20, arts. 32, 54, 2 Stat. 359, 363-64, 366. In addition, in 1863, Congress passed a statute expressly enumerating crimes, including murder, rape, and wounding, that were punishable by court martial when committed by military personnel in wartime – a prohibition that was subsequently incorporated into the Articles of War. Act of Mar. 3, 1863, ch. 75, § 30, 12 Stat. 731, 736; *see* U.S. REV. STAT. § 1342, art. 58 (1875).

During the 19th and early 20th Centuries, Congress made periodic amendments to the Articles of War and the Articles for the Government of the Navy, and it repeatedly enacted revised versions of both sets of Articles in their entirety. *See* Act of July 17, 1862, ch. 204, § 1, 12 Stat. 600, 600-06 (Articles for the Government of the Navy); U.S. REV. STAT. § 1342 (1875) (Articles of War); *id.* § 1624 (Articles for the Government of the Navy); U.S. REV. STAT. § 1342 (2d ed. 1878) (Articles of War); *id.* § 1624 (Articles for the Government of the Navy); Act of Aug. 29, 1916, ch. 418, § 3, 39 Stat. 619, 650-70 (Articles of War); Act of June 4, 1920, ch. 227, subch. 2, 41 Stat. 759, 787-812 (Articles of War). When the United States Code was compiled in 1926, the Code incorporated both the Articles of War and the Articles for the Government of the Navy. *See* 10 U.S.C. §§ 1471-1593 (1926); 34 U.S.C. § 1200 (1926).

In 1950, Congress enacted the Uniform Code of Military Justice to revise and consolidate the Articles of War and the

Articles for the Government of the Navy (as well as the disciplinary laws of the Coast Guard). *See* Act of May 5, 1950, ch. 169, 64 Stat. 107. The UCMJ was substantially revised in 1968 and again in 1983. *See* Military Justice Act of 1968, Pub. L. No. 90-632, 82 Stat. 1335; Military Justice Act of 1983, Pub. L. No. 98-209, 97 Stat. 1393.

The UCMJ sets forth a detailed code of conduct for the military. Among other things, the UCMJ – like the Articles it replaced – prohibits members of the U.S. Armed Forces from committing murder, manslaughter, or rape. 10 U.S.C. §§ 918-920. Those provisions apply to U.S. soldiers' conduct in war, including both conduct directed toward civilians and conduct directed toward enemy belligerents outside of actual hostilities. For example, in 1973 the Army Court of Military Review upheld the court-martial conviction of First Lieutenant William L. Calley, Jr. under the UCMJ for the murder of "unarmed, unresisting" Vietnamese villagers at My Lai. *United States v. Calley*, 46 C.M.R. 1131, 1165 (A.C.M.R. 1973).

Similarly, the UCMJ prohibits U.S. military personnel from engaging in "cruelty toward, or oppression or maltreatment of, any person subject to [their] orders," including captured enemy personnel. 10 U.S.C. § 893. The Court of Appeals for the Armed Forces has held that the UCMJ imposes on U.S. service members an "affirmative duty to protect the detainees under [their] charge from abuse," which duty is "not affected by" the detainees' "international legal status." *United States v. Graner*, 69 M.J. 104 (C.A.A.F. 2010) (upholding court-martial conviction under UCMJ for maltreatment of detainees at military facility in Abu Ghraib, Iraq); *see also United States v. Harman*, 68 M.J. 325 (C.A.A.F. 2010) (same); *United States v. Smith*, 68 M.J. 316 (C.A.A.F. 2010) (same).

The UCMJ also guarantees a number of procedural and substantive rights to prisoners of war who are accused of crimes and tried before courts martial. Those rights include appointment of counsel, equal opportunity to obtain witnesses and evidence, judicial review, and protection against compulsory self-incrimination, double jeopardy, and cruel and unusual punishment. *See* 10 U.S.C. §§ 802(a)(9), (13), 818, 831, 838, 844, 846, 855, 867-867a, 870.

In addition to those statutes regulating conduct during war, the War Powers Resolution was enacted by Congress in 1973. In its most pertinent provision, the War Powers Resolution prohibits the President from deploying U.S. Armed Forces in hostile situations for more than 62 calendar days unless Congress specifically authorizes the deployment. *See* 50 U.S.C. §§ 1543(a), 1544(b).[13]

Since passage of the AUMF in 2001, Congress has enacted additional legislation regulating the Executive's conduct of the war. These statutes reveal that Congress has repeatedly responded with new legislation addressing some of the unique issues posed by a war against a non-uniformed enemy. These statutes further demonstrate that Congress knows how to legislate war-related restrictions on the Executive – and does not need or intend for the courts to impose new international-law-based restrictions. For example, as part of the Detainee Treatment Act of 2005, Congress provided in broad terms that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location,

---

[13] Many Administrations have questioned the constitutionality of the War Powers Resolution, but that is not relevant for this discussion.

shall be subject to cruel, inhuman, or degrading treatment or punishment" and that military detainees in the custody or control of the Department of Defense shall not be subject to methods of interrogation not specifically authorized in the Army Field Manual on Intelligence Interrogation. §§ 1002-1003, Pub. L. No. 109-148, div. A, tit. 10, 119 Stat. 2739, 2739-40 (codified at 10 U.S.C. § 801 note and 42 U.S.C. § 2000dd). And in the Military Commissions Acts of 2006 and 2009, Congress guaranteed unprivileged enemy belligerents many of the same procedural and substantive rights the UCMJ affords to prisoners of war. *See* 10 U.S.C. §§ 948b(a), 949c(b), 949h, 949j, 949s, 950g, 950h. In the 2006 MCA, Congress also updated the War Crimes Act to clarify which violations of Common Article 3 of the 1949 Geneva Conventions are punishable as war crimes under domestic U.S. law. *See* MCA of 2006, Pub. L. No. 109-366, sec. 6(b), 120 Stat. 2600, 2633-35 (amending 18 U.S.C. § 2441).[14]

---

[14] The numerous statutory limitations on the wartime actions of the Executive Branch are supplemented by a variety of legally binding regulations that the Executive Branch itself has long promulgated to govern the wartime activities of the U.S. Armed Forces. In 1863, President Lincoln famously issued General Orders No. 100, more commonly known as the Lieber Code. *See* General Orders No. 100: Instructions for the Government of Armies of the United States in the Field (Apr. 24, 1863), *reprinted in* RICHARD SHELLY HARTIGAN, LIEBER'S CODE AND THE LAW OF WAR 45-71 (1983).

Today, for example, Army Regulation 190-8 governs the treatment of enemy prisoners of war and other detainees in the custody of the U.S. Armed Forces. *See* Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Reg. 190-8 (Oct. 1, 1997).

When Congress passes a war-authorizing statute like the AUMF, such regulations – like the statutes described in the text above – form part of the domestic U.S. law of war background

This extensive body of domestic U.S. laws of war shows that Congress knows how to impose limits on the wartime conduct of the Executive Branch when it wants to do so. To the extent Congress has not seen the need to regulate every last aspect of the President's waging of war, we can assume that Congress has confidence in the President's ability to exercise his discretion appropriately – and if it loses such confidence, Congress may act anew to further limit that presidential discretion, as it has done on numerous occasions. *See Agee*, 453 U.S. at 291-92; *cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). For present purposes, the critical point is this: The significant body of laws regulating the Executive undermines any argument that Congress silently intended for U.S. courts to impose additional limitations on the Executive's conduct of a congressionally authorized war effort. That is especially true with respect to limitations based on international-law norms that Congress and the President have chosen not to incorporate into domestic U.S. law.

This expansive collection of domestic U.S. laws of war also answers Judge Williams' concern that it "would be an odd member of Congress who supposed that in authorizing the use of military force he was embracing uses equivalent to *all* such uses that have ever occurred: think Nanking 1937-38; Katyn 1940; Lidice 1942; My Lai 1968." Williams Op. at 2-3. When a war-related practice is truly subject to universal, worldwide condemnation to the degree Judge Williams seems

against which Congress legislates. To be sure, the Executive is always free to change its regulations, but the existence of these longstanding regulations is not irrelevant when attempting to divine whether Members of Congress in 2001 actually intended for international law to operate as an additional judicially enforceable constraint on the President.

to contemplate, it typically also contravenes American values, and Congress and the President in turn have tended to ban the practice. The historical atrocities Judge Williams invokes, such as rape, torture, and the killing of civilians, are all prohibited by the domestic U.S. laws described above. Notably, Judge Williams points to no examples of violations of international law that are contrary to fundamental American values but are not already independently prohibited by domestic U.S. law.

Contrary to Judge Williams' implication, however, it has not been Congress's stated intent or practice to rely on federal courts to pick and choose additional international-law principles to constrain the Executive. Judge Williams cites no evidence to support his view that Members of Congress actually intended as much when they voted on September 14, 2001.

D

Up to this point, my argument about the AUMF and international law has been straightforward: Congress knows how to regulate U.S. war efforts, and it has done so extensively on many occasions, creating an elaborate body of domestic U.S. laws of war. And furthermore, Congress knows how to reference international law when it so chooses. The AUMF does not reference international law, nor is there any indication in the legislative debates of a congressional intent to incorporate international law into the AUMF. Therefore, we should interpret the AUMF's textual silence with respect to international law as indicative of a congressional intent not to impose judicially enforceable international-law limits on the President's war-making authority. Under this approach, the default presumption is that international law is not a judicially enforceable limit on a

President's wartime authority *unless Congress expressly says it is*.

Al-Bihani and amici seek to flip that default presumption by invoking the *Charming Betsy* canon of statutory construction. According to their articulation of that canon, ambiguities in federal statutes must be interpreted in accord with international-law norms that are not themselves domestic U.S. law. *See Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 114 (1987). Al-Bihani and amici thus argue that international law is a judicially enforceable limit on the President's authority under a war-authorizing statute *unless Congress expressly says it is not*.[15]

---

[15] When courts construe ambiguous statutes to conform to pre-existing statutes or self-executing treaties, which *are* part of domestic U.S. law, courts are not applying *Charming Betsy* but instead are applying a different canon of construction: the familiar presumption against implied repeal. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007) (the Court "will not infer a statutory repeal" unless Congress's intention is clear); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) (refusing to find "implicit repeal" of self-executing treaty in "ambiguous congressional action").

It is uncontroversial that courts must apply the presumption against implied repeal when interpreting the AUMF. In *Hamdan v. Rumsfeld*, for example, the Supreme Court held that the AUMF did not impliedly repeal a pre-existing federal statute – Article 21 of the Uniform Code of Military Justice, 10 U.S.C. § 821 – because "[r]epeals by implication are not favored." 548 U.S. 557, 593-95 (2006) (quoting *Ex parte Yerger*, 75 U.S. 85, 105 (1869)).

But the fact that courts must interpret the AUMF not to implicitly repeal pre-existing *domestic U.S. law* obviously does not mean that courts must interpret the AUMF consistently with

Al-Bihani's argument is flawed for any of three alternative reasons discussed below in order from broadest to narrowest. First, after *Erie*, *Sosa*, and *Medellín*, courts should not invoke the *Charming Betsy* canon to conform federal statutes to non-self-executing treaties or customary international law. Second, even if the *Charming Betsy* canon carries weight in some such cases, it is not properly invoked *against the Executive* to conform statutes to non-self-executing treaties or customary international law. Third, even if use of the *Charming Betsy* canon is proper against the Executive in some cases, it is improper when the statute at issue is *a congressional authorization of war*.

1

As an initial matter, Al-Bihani's invocation of *Charming Betsy* fails because he wants courts to alter their interpretation of the AUMF based on non-self-executing treaties and customary international law.

After *Erie*, and particularly after the Supreme Court's recent decisions in *Sosa* and *Medellín*, there is no legitimate basis for courts to alter their interpretation of federal statutes to make those statutes conform with non-self-executing treaties and customary international law, given that those sources lack any status as domestic U.S. law.

With respect to non-self-executing treaties, there is a strong inference that Congress deliberately chose not to incorporate such treaties into domestic U.S. law. Every non-self-executing treaty to which the United States is a party has

_____

international-law norms that Congress has not incorporated into domestic U.S. law.

been presented to and concurred in by the Senate, as required by the U.S. Constitution. Thus, courts can presume that Congress is fully aware of the international commitments and obligations that such treaties embody. The fact that the Senate has concurred in a non-self-executing treaty – thereby making it binding on the United States as a matter of international law and obligation – but Congress has not passed a statute to implement the treaty domestically, indicates that Congress did not want those norms to be part of domestic U.S. law. It therefore makes sense to conclude that Congress would not want courts to smuggle those norms into domestic U.S. law through the back door, by using them as a basis to alter judicial interpretation of a federal statute. *See Medellín*, 552 U.S. at 522 ("Congress knows how to accord domestic effect to international obligations [in a non-self-executing treaty] when it desires such a result"); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 880 (D.C. Cir. 2006) (Kavanaugh, J., concurring).

As to customary international law, the problems with applying *Charming Betsy* are equally substantial. There was a good argument for interpreting statutes in light of customary international law in the days before *Erie*, when customary-international-law principles were considered part of the general common law that all federal courts could enforce. *See, e.g.*, John F. Manning, *Deriving Rules of Statutory Interpretation from the Constitution*, 101 COLUM. L. REV. 1648, 1680 n.146 (2001) ("To the extent that courts applying the law of nations believed that they were implementing a preexisting body of customary law, they may have felt somewhat greater freedom to exercise such independent common law powers in relation to statutes."). After *Erie* and particularly after *Sosa*, however, it is clear that customary-international-law norms, like non-self-executing treaties, are not part of domestic U.S. law. Congress has incorporated

customary international law into domestic U.S. law on numerous occasions, including in statutes related to war. Thus, when Congress does not act to incorporate those norms into domestic U.S. law, such non-incorporation presumably reflects a deliberate congressional choice. And it likewise makes sense to conclude that Congress would not want courts to smuggle those norms into domestic U.S. law through the back door by using them to resolve questions of American law. As the Seventh Circuit has stated, use of the *Charming Betsy* canon "so as to effectively incorporate customary international law into federal statutes when the political branches of our government may have rejected the international law at issue seems dubious at best." *Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1153 (7th Cir. 2001); *see also* Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 HARV. L. REV. 815, 871-72 (1997) (affording customary international law its proper status is arguably inconsistent with the *Charming Betsy* canon); Curtis A. Bradley, *The* Charming Betsy *Canon and Separation of Powers: Rethinking the Interpretive Role of International Law*, 86 GEO. L.J. 479, 536 (1997) ("the redefinition of federal court power after *Erie*" "compel[s] re-examination of" the *Charming Betsy* canon); Note, *The* Charming Betsy *Canon, Separation of Powers, and Customary International Law*, 121 HARV. L. REV. 1215, 1221-22 (2008) ("courts arguably violate the separation of powers when they cabin congressional lawmaking power with a canon that draws force from a body of law that has no constitutional origin and does not promote any competing constitutional value").[16]

---

[16] Some maintain that Congress would want a court to alter its interpretation of a statute based on a non-self-executing treaty or customary international law. There is no persuasive evidence to

support that romantic view of congressional intent. To begin with, the best – and only reliable – evidence of congressional intent is what Congress chooses to enact into domestic U.S. law. Because Congress regularly acts to incorporate principles derived from non-self-executing treaties and customary international law into domestic U.S. law, we can assume that it acts deliberately when it chooses not to do so.

Moreover, recent decades have seen mounting extra-statutory evidence that "compliance with international law is often not the political branches' paramount concern." Bradley, *The* Charming Betsy *Canon*, 86 GEO. L.J. at 518. To take one recent example: In *Medellín*, the Supreme Court recognized that the United States had an international-law obligation to comply with the International Court of Justice's *Avena* decision holding that certain U.S. prisoners, including Medellín, were entitled to review and reconsideration of their convictions and sentences. *See* 552 U.S. at 504, 508, 520. But Congress did not act on a bill that would have implemented the *Avena* decision domestically, and Medellín was put to death by the State of Texas. *See Medellín v. Texas*, 129 S. Ct. 360, 361 (2008) (per curiam) (possibility that Congress might implement *Avena* through domestic legislation was "too remote to justify" a stay of execution, given that Congress had "not progressed beyond the bare introduction of a bill"); Jeremy Lawrence, *Treaty Violations, Section 1983, and International Law Theory*, 16 SW. J. INT'L L. 1, 23-24 (2010).

Evidence like this – and there is a good deal of it – makes it difficult to plausibly maintain that courts vindicate any realistic notion of actual congressional intent by altering their interpretation of statutes to conform to non-self-executing treaties or customary international law. Indeed, if anything, there seems to be evidence that Congress affirmatively distrusts certain international legal organizations. For example, in 2004, the House of Representatives passed a resolution stating that it:

> (4) deplores –
>
> > (A) the misuse of the International Court of Justice (ICJ) by a plurality of member nations of the United Nations General Assembly for the narrow

After *Erie*, and particularly after *Sosa* and *Medellín*, courts should not invoke the *Charming Betsy* canon to conform federal statutes to non-self-executing treaties and customary international law. Invocation of the *Charming Betsy* canon in such circumstances constitutes an "indirect, 'phantom' use of international law" that can "have the same effect as direct incorporation of international law." Bradley, *The* Charming Betsy *Canon*, 86 GEO. L.J. at 483. Applying *Charming Betsy* to customary international law and non-self-executing treaties would create an "international law-based, quasi-constitutional 'penumbra' that crowds out and inhibits congressional lawmaking." Note, *The* Charming Betsy *Canon*, 121 HARV. L. REV. at 1222; *cf.* Daniel J. Freeman, *The Canons of War*, 117 YALE L.J. 280, 321 (2007) ("If the international law provision is not clearly enforceable – either through integration in a statute or express self-execution – then international law yields. However, if international law is domestically implemented or clearly self-executing, then the AUMF should not overrule it . . . .").

---

political purpose of advancing the Palestinian position on matters Palestinian authorities have said should be the subject of negotiations between the parties; and

    (B) the July 9, 2004 advisory judgment of the ICJ, which seeks to infringe upon Israel's right to self-defense, including under Article 51;

(5) regrets the ICJ's advisory judgment, which is likely to undermine its reputation and interfere with a resolution of the Palestinian-Israeli conflict; [and]

    (6) commends the President and the Secretary of State for their leadership in marshaling opposition to the misuse of the ICJ in this case[.]

H.R. Res. 713, 108th Cong. (2004).

The Supreme Court's case law since *Erie* is consistent with this limited role for international law as a device for interpreting ambiguous federal statutes. In the seven-plus decades since the Supreme Court's landmark 1938 decision in *Erie*, the Court has invoked *Charming Betsy* only sporadically. It has done so to lend support to a distinct and far narrower canon of statutory construction: the rule that absent a clear statement from Congress, federal statutes do not apply outside the United States. This is often called the presumption against extraterritoriality. *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164-65 (2004) (Sherman Act did not apply to foreign effects of price-fixing conduct); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963) (National Labor Relations Act did not apply to foreign-flag vessel employing alien seamen); *Lauritzen v. Larsen*, 345 U.S. 571, 577-78 (1953) (Jones Act did not apply to injuries sustained by alien seaman aboard foreign-flag vessel in foreign waters).

Those extraterritoriality cases constitute a unique category. As the Court has recognized, special concerns counsel against applying domestic U.S. law extraterritorially because doing so can often conflict with the laws of another sovereign. In such situations, the presumption against extraterritoriality serves not just to honor the United States' international-law obligations as a general matter, but to "avoid or resolve conflicts between competing laws" established by two sovereign nations. *Lauritzen*, 345 U.S. at 582; *see also Hoffmann-La Roche*, 542 U.S. at 164-65 (presumption "helps the potentially conflicting laws of different nations work together in harmony"); *Sociedad Nacional*, 372 U.S. at 21 ("concurrent application" of U.S. and foreign law to the same conduct would create a "possibility of international discord"). The Court's citation of *Charming Betsy* in cases applying the presumption against

extraterritoriality does not support invocation of the canon outside of that narrow context. *Cf.* Gov't Cert. Opp. Br. at 12-13, *Koyo Seiko Co. v. United States*, 543 U.S. 976 (2004) (Solicitor General arguing that "cases applying *Charming Betsy* have . . . involved avoidance of 'unreasonable interference with the sovereign authority of other nations'") (quoting *Hoffman-La Roche*, 542 U.S. at 164).[17]

In short, neither judicial respect for international law nor available evidence regarding actual congressional intent nor post-*Erie* Supreme Court precedent justifies use of the

---

[17] In *Weinberger v. Rossi*, 456 U.S. 25 (1982), the Court considered a statute that prohibited employment discrimination against U.S. citizens on U.S. military bases overseas unless such discrimination was permitted by "treaty." Based on a variety of considerations including precedent, foreign policy implications, and legislative history, the Court construed the term "treaty" in the statute to include congressional-executive agreements with foreign nations, and thus concluded that the statute did not override a prior congressional-executive agreement with the Philippines. *Id.* at 28-36. The Court also cited *Charming Betsy* in passing, but the case did not concern a statute's interaction with customary international law or a non-self-executing treaty; rather, it concerned a statute's interaction with a congressional-executive agreement, the language of which made the agreement self-executing and thus domestic U.S. law. *See id.* at 26-27 & n.2 (agreement was made pursuant to statute and provided that the "United States Armed Forces in the Philippines *shall* fill the needs for civilian employment by employing Filipino citizens") (emphasis added); *cf. Medellín*, 552 U.S. at 508-09. Therefore, although *Weinberger* may have implicated the presumption against implied repeal, it did not concern the application of the *Charming Betsy* canon to customary international law or non-self-executing treaties.

*Charming Betsy* canon to conform federal statutes to non-self-executing treaties or customary international law.[18]

2

Even if one disagrees with that first point about *Charming Betsy*, there is an alternative (and far narrower) reason why the *Charming Betsy* canon does not apply to interpretation of the 2001 AUMF: The *Charming Betsy* canon may not be invoked *against the Executive* to conform statutes to non-self-executing treaties or customary international law. The basic reason is that the Executive – not international law or an international tribunal – possesses the authority in the first instance to interpret ambiguous provisions in statutes and to determine how best to weigh and accommodate international-law principles not clearly incorporated into a statute.

---

[18] To be sure, a U.S. court interpreting a federal statute or constitutional provision can look at the reasoning of a foreign or international tribunal on a similar issue. As Justice Ginsburg recently pointed out, although "foreign decisions do not rank as precedent" for U.S. courts, "they could be informative in much the same way as one might gain knowledge or insight from reading a law review article." Ruth Bader Ginsburg, "A decent Respect to the Opinions of [Human]kind": The Value of a Comparative Perspective in Constitutional Adjudication, Address to the International Academy of Comparative Law (July 30, 2010). A U.S. court examining and giving "respectful attention" to the reasoning of a non-U.S. tribunal is, of course, entirely different from a U.S. court either (i) saying that international law is itself domestic U.S. law or (ii) altering its interpretation of a statute or constitutional provision so as to conform domestic U.S. law to international or foreign law.

Since *Erie*, the Supreme Court has never invoked the *Charming Betsy* canon to decide a case against the Executive. The Ninth Circuit has explained why courts should not do so. *See United States v. Corey*, 232 F.3d 1166, 1179 n.9 (9th Cir. 2000).

As Judge Kozinski stated in *Corey*, a primary purpose of the *Charming Betsy* canon is to avoid having a *court* "embroil[] the nation in a foreign policy dispute unforeseen by either the President or Congress." *Id.* But when the action that allegedly violates international law is taken by the Executive, courts can "presume that the President has evaluated the foreign policy consequences" of that action "and determined that it serves the interests of the United States." *Id.*; *see also ARC Ecology v. U.S. Dep't of the Air Force*, 411 F.3d 1092, 1102 (9th Cir. 2005) (same).

Importantly, if courts "construe an authorizing statute like the AUMF to permit the President to violate international law," those courts "would not be placing the United States in violation of international law. Rather, such a violation would occur, if at all, only after the Executive Branch, which is both politically accountable and expert in foreign relations, made an independent judgment to exercise the authority conferred by Congress in a way that violated international law." Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2098 n.226.

Other judicial decisions have agreed that the Executive's interpretation of an ambiguous statute should trump the *Charming Betsy* canon and any lurking international-law norms. For example, the Federal Circuit stated in a Commerce Department case: "[If] Commerce's interpretation of its statutory power falls within the range of permissible construction . . . that ends our inquiry on this branch of the

case. . . . [E]ven if we were convinced that Commerce's interpretation conflicts with the [General Agreement on Tariffs and Trade], which we are not, the GATT is not controlling." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 667 (Fed. Cir. 1992); *see also Timken Co. v. United States*, 354 F.3d 1334, 1343-44 (Fed. Cir. 2004), *cert. denied sub nom. Koyo Seiko Co.*, 543 U.S. 976.

Scholars have likewise maintained that *Charming Betsy* should not trump *Chevron* or *Chevron*-like deference with respect to violations of non-self-executing treaties and customary international law, given that "[v]iolations of those forms of law, after all, do not substantially implicate domestic legal continuity; instead, they implicate foreign relations issues that would seem to fall within the expertise of the executive branch." Curtis A. Bradley, Chevron *Deference and Foreign Affairs*, 86 VA. L. REV. 649, 689 (2000); *see also* Mary Jane Alves, *Reflections on the Current State of Play: Have U.S. Courts Finally Decided To Stop Using International Agreements and Reports of International Trade Panels in Adjudicating International Trade Cases?*, 17 TUL. J. INT'L & COMP. L. 299, 315 (2009) ("an agency's interpretation of a silent or ambiguous statute" should not be rejected under *Charming Betsy* merely because the agency's interpretation conflicts with a non-self-executing treaty); Kristina Daugirdas, *International Delegations and Administrative Law*, 66 MD. L. REV. 707, 748 (2007) (in light of *Chevron*, courts applying *Charming Betsy* in cases involving the Executive should "read ambiguous statutes to permit (but not to require) agencies to take actions that are necessary to comply with international legal obligations"); Arwel Davies, *Connecting or Compartmentalizing the WTO and United States Legal Systems? The Role of the* Charming Betsy *Canon*, 10 J. INT'L ECON. L. 117, 143 (2007)

(*Charming Betsy* should "not be used to vacate agency interpretations").

Put another way, Congress has authority in the first instance to incorporate international-law norms into a statute. When Congress has not done so, the Executive still has authority to construe ambiguities in the statute so as not to violate international-law norms. Absent action by either Branch to incorporate or abide by international-law norms, however, by what authority can courts force those norms on the political branches?

In sum, when Congress has broadly authorized the President to take certain actions, and that broad authorization encompasses actions that might in turn violate international law, courts have no legitimate basis to invoke international law as a ground for second-guessing the President's interpretation.[19]

---

[19] To the extent some might find the opinions of foreign or international tribunals helpful in assessing American law, I note as a point of comparison that the United Kingdom's Law Lords have reached the same conclusion with regard to the British equivalent of the *Charming Betsy* canon. In a 1991 decision, the Lords ruled that Britain's canon of construction requiring courts to interpret statutes to conform with international law could not be applied to limit executive action. *See R v. Sec'y of State for the Home Dep't, Ex parte Brind*, [1991] 1 A.C. 696, 748 (H.L.) (opinion of Lord Bridge) ("where Parliament has conferred on the executive an administrative discretion without indicating the precise limits within which it must be exercised, to presume that it must be exercised within" limits set by international law "would be a judicial usurpation of the legislative function"); *id.* at 761-62 (opinion of Lord Acker) (where a statutory grant of authority to the Secretary of State "contains within its wording no fetter upon the extent of the discretion it gives," the Secretary's failure to comply with international law does not "render[] his decision unlawful"; a

3

Even if one disagrees with both preceding points about *Charming Betsy*, there is another alternative (and still narrower) reason why the *Charming Betsy* canon does not apply to interpretation of the 2001 AUMF. The *Charming Betsy* canon may not be invoked against the Executive *to limit the scope of a congressional authorization of war* – that is, to limit a war-authorizing statute to make it conform with non-self-executing treaties and customary international law.

The Supreme Court has never held that the *Charming Betsy* canon applies to a statute that authorizes the President to use military force against a foreign enemy. For good reason. Applying *Charming Betsy* to a statute like the AUMF would contravene the well-established principle that the Judiciary should not interfere when the President is executing national security and foreign relations authority in a manner consistent with an express congressional authorization (that is, in Justice Jackson's *Youngstown* Category One), at least unless there is a separate constitutional limitation.

To the extent there is ambiguity in the AUMF, that ambiguity should be addressed in the first instance by the President, not by international law or international tribunals. As Justice Jackson stated in his historic *Youngstown* opinion, courts should "indulge the widest latitude of interpretation to sustain [the President's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society." *Youngstown*

contrary conclusion would incorporate international law "into English domestic law by the back door").

*Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring).

That bedrock tenet of judicial restraint has been articulated by the Supreme Court in numerous cases. As the Court stated quite plainly in *Department of the Navy v. Egan*, for example, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." 484 U.S. 518, 530 (1988); *see also Dames & Moore*, 453 U.S. at 678 ("failure of Congress specifically to delegate authority does not, 'especially . . . in the areas of foreign policy and national security,' imply 'congressional disapproval' of action taken by the Executive") (quotation omitted); *Agee*, 453 U.S. at 291 ("in the areas of foreign policy and national security . . . congressional silence is not to be equated with congressional disapproval"); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322 (1936) (courts should "hesitate long before limiting or embarrassing" the President's exercise of foreign relations authority pursuant to a congressional authorizing statute) (quotation and emphasis omitted); *cf. Chevron*, 467 U.S. at 842-45.[20]

---

[20] Courts sometimes construe the scope of congressional authorization more narrowly with respect to war-related activities against U.S. citizens, in part because of the constitutional avoidance canon. *See Ex parte Endo*, 323 U.S. 283, 300 (1944) ("In interpreting a wartime measure we must assume . . . . that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used."). *But see Hamdi*, 542 U.S. at 547 (Souter, J., concurring in part, dissenting in part, and concurring in judgment) (arguing that plurality had failed to construe AUMF narrowly with regard to an American citizen detainee); *id.* at 574 (Scalia, J., dissenting) (same).

That deeply rooted tradition of judicial restraint when the President is executing national security or foreign affairs statutes pursuant to a broad congressional authorization stems from at least three interpretive sources – one based on basic tenets of statutory interpretation and the tripartite separation of powers; one based on Article II of the Constitution and the constitutional avoidance canon; and one based on prudential considerations.

*First*, as to statutory interpretation, the Supreme Court has recognized that Congress, for reasons of practical necessity and efficiency, often assigns broad authority to the Executive in the areas of national security and foreign policy. As the Court has noted, the field of national security and foreign affairs presents "important, complicated, delicate and manifold problems." *Curtiss-Wright*, 299 U.S. at 319. And "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act." *Dames & Moore*, 453 U.S. at 678. Moreover, the President, "not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war." *Curtiss-Wright*, 299 U.S. at 320. Therefore, "Congress – in giving the Executive authority over matters of foreign affairs – must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Agee*, 453 U.S. at 292 (quotation and emphasis omitted); *see also Curtiss-Wright*, 299 U.S. at 320 (foreign affairs statutes "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"); *cf. Egan*, 484 U.S. at 529 ("protection of classified information must be committed to the broad discretion of the agency responsible" because "an outside non-expert body" is not competent to make or evaluate such judgments).

Courts are thus rightly hesitant to construe foreign affairs statutes more narrowly than the text indicates, lest they inadvertently contravene Congress's prudent and reasonable decision to afford the President broad discretion in sensitive and difficult-to-predict national security issues. Put simply, Congress knows how to limit the Executive's authority in national security and foreign policy; there is no reason or basis for courts to strain to do so absent such congressional direction.

*Second*, this traditional deference in interpreting national security statutes also finds support in the constitutional avoidance canon. In the domain of foreign relations and military affairs, the President possesses at least some Article II authority to act even without congressional authorization, as explained more fully in Part III below. *See, e.g.*, *Egan*, 484 U.S. at 529-30; *Curtiss-Wright*, 299 U.S. at 320. Indeed, in the text of the AUMF itself, Congress acknowledged that the President has independent constitutional authority to act without congressional authorization in defense of the Nation. *See* AUMF pmbl., 115 Stat. at 224 ("the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States"); *see also* War Powers Resolution § 2(c), 50 U.S.C. § 1541(c) (President as Commander in Chief has "constitutional power[]" to introduce U.S. Armed Forces into hostilities without congressional authorization in response to an "attack upon the United States, its territories or possessions, or its armed forces"). That point is perhaps best exemplified in recent history by a number of significant military actions taken by President Clinton without congressional authorization, such as his bombing of suspected al Qaeda targets in Afghanistan and Sudan in 1998.

Courts are therefore properly reluctant to construe broad national security statutes like the AUMF more restrictively than their statutory text, lest the courts interfere with the President's independent constitutional authority or have to confront difficult constitutional questions regarding the scope of the President's Article II authority to act without congressional authorization. *See* Cass R. Sunstein, *Administrative Law Goes to War*, 118 HARV. L. REV. 2663, 2670-71 (2005) ("statutory enactments involving core executive authority" – such as the "authority to protect the nation when its security is threatened" – "should be construed hospitably to the President so as to avoid the constitutional difficulties that a narrow construction would introduce"); *see also* Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2098 (questioning whether the *Charming Betsy* canon should apply to "a grant of discretionary enforcement authority to the President" that "overlaps with the President's independent constitutional powers"); WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION 325 (1994) (describing "[s]uper-strong rule against congressional interference with the president's authority over foreign affairs and national security").

*Third*, prudential considerations likewise suggest that *Charming Betsy* is inapposite when courts interpret war-authorizing statutes. Construing the AUMF to create judicially enforceable international-law constraints on the President's war-related authority would require the Judiciary to make highly subjective policy judgments that it is not well-suited to make – and should not make absent congressional direction. The President's execution of foreign affairs statutes often "requires judgments of policy and principle, and the foreign policy expertise of the executive places it" – not courts – "in the best position to make those judgments." Eric A. Posner & Cass R. Sunstein, Chevron*izing Foreign*

*Relations Law*, 116 YALE L.J. 1170, 1176 (2007); *see id.* at 1205-07.

Many international-law norms are vague, contested, or still evolving. Simply determining the precise content of those norms at any given time entails a considerable exercise of subjective judgment. Applying them to particular factual situations adds another layer of subjectivity. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004) ("a judge deciding in reliance on an international norm will find a substantial element of discretionary judgment in the decision"); JACK L. GOLDSMITH & ERIC A. POSNER, THE LIMITS OF INTERNATIONAL LAW 23-24 (2005) (discussing difficulties in ascertaining content of customary international law). And deciding how those international-law norms should apply to a war that differs in fundamental ways from traditional models of armed conflict presents especially thorny questions of policy and prudence. Moreover, judicial assessment of contested international-law norms can take years, but the President often needs to make military decisions immediately or at least quickly – a reality that calls for judicial caution before restraining the President's exercise of war powers.

Thus, it is hard to conceive of a task less appropriate for U.S. judges – or less consistent with our constitutional structure – than judicial invocation, without a constitutional or congressional mandate, of uncertain and changing international-law norms to restrain the President and the U.S. military in waging a congressionally authorized war abroad. It is the President's duty and responsibility to win the war, in a manner consistent with the Constitution and with constitutionally permissible limits imposed by Congress. Courts should not interfere with that effort unless the

Constitution, a federal statute, or a self-executing treaty so requires.[21]

---

[21] A fine illustration of the difficulty of applying international-law norms is the recent back-and-forth over the proper legal framework for targeted killing of alleged terrorists by the United States using unmanned aerial vehicles, or "drones," in Pakistan and elsewhere.

In March 2010, the Legal Adviser to the U.S. State Department asserted that U.S. drone operations "comply with all applicable law, including the laws of war." Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, The Obama Administration and International Law: Address at the Annual Meeting of the American Society of International Law (Mar. 25, 2010). The Legal Adviser took the position that "as a matter of international law, the United States is in an armed conflict with al-Qaeda, as well as the Taliban and associated forces" and that "individuals who are part of such an armed group are belligerents and, therefore, lawful targets under international law." *Id.*

Some of those conclusions were subsequently challenged, however, by the United Nations Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, Professor Philip Alston. *See* U.N. Human Rights Council, *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, Addendum: Study on Targeted Killings*, U.N. Doc. A/HRC/14/24/Add.6 (May 28, 2010) (*prepared by* Philip Alston). Special Rapporteur Alston stated that it was "problematic" for the United States to claim that it is in an armed conflict with al Qaeda, the Taliban, and associated forces "outside the context of the armed conflicts in Afghanistan or Iraq," and that if the United States is not in an armed conflict with al Qaeda, such targeted killings "cannot be legal" under international law. *Id.* ¶¶ 33, 53. Special Rapporteur Alston also maintained that even assuming the United States is in an armed conflict with al Qaeda, international law still would not permit the United States to target individuals based on mere "membership" in al Qaeda, but would instead require the United States to demonstrate that those individuals' conduct rose to the level of "direct participation in hostilities." *See id.* ¶ 58, 62-67.

Consider some of the radical implications of the position advanced by Al-Bihani and amici. The 15 judges on the International Court of Justice include judges from China, Russia, Jordan, Somalia, France, Brazil, and Sierra Leone, among other nations. Suppose, for example, that the ICJ issues an important ruling on a matter of international law related to the U.S. war against al Qaeda. One can have the greatest respect (as I do) for the judges on the ICJ and at the same time think it odd for a U.S. court to give more weight to the views of Chinese and Russian jurists, for example, than to the interpretation of the U.S. President when the court is interpreting a domestic U.S. war-authorizing statute that does not itself reference international law. Yet that is the necessary and highly irregular result of the approach advocated by Al-Bihani and his amici.

In light of those statutory, constitutional, and prudential considerations, we would upend Supreme Court precedent and basic elements of our constitutional architecture were we to apply the *Charming Betsy* canon to war-authorization statutes such as the 2001 AUMF. Courts should not rely on *Charming Betsy* to transform affirmative congressional authorization of a war into a legislative mandate for courts to restrain the President's conduct of that war based on sometimes vague, contested, or still-evolving international-law principles.

---

This rather stark difference of opinion between the U.S. State Department and the U.N. Special Rapporteur simply underscores the murkiness and uncertainty surrounding the application of international-law norms to the war in which the United States is presently engaged. It suggests that judges should not wade into debates of this kind and hamper the President's direction of a war without a constitutional or congressional mandate to do so.

66

*　*　*

To sum up on *Charming Betsy*: The canon exists to the extent it supports applying the presumption against extraterritorial application of federal statutes. Beyond that, after *Erie* and particularly after *Sosa* and *Medellín*, it is not appropriate for courts to use the *Charming Betsy* canon to alter interpretation of federal statutes to conform them to norms found in non-self-executing treaties and customary international law, which Congress has not chosen to incorporate into domestic U.S. law. In the alternative, even if one disagrees with that broader proposition and concludes that use of the *Charming Betsy* canon is appropriate in some such cases, it should not be invoked against the Executive Branch, which has the authority to weigh international-law considerations when interpreting the scope of ambiguous statutes. And even if one also disagrees with that, it is not appropriate for courts to narrow a congressional authorization of war based on international-law norms that are not part of domestic U.S. law.

E

Al-Bihani and amici cite *Hamdi v. Rumsfeld* to support their argument that the President's authority under the AUMF is limited by international law. They assert that *Hamdi* in effect already applied *Charming Betsy* to the AUMF. That contention is erroneous.

The detainee in *Hamdi* was a U.S. citizen who argued that his detention was forbidden by the Non-Detention Act. That Act prohibits detention of U.S. citizens unless authorized by statute. *See* 18 U.S.C. § 4001(a). The relevant questions for the *Hamdi* Court, therefore, were (i) whether the AUMF authorized detention of enemy combatants in the war against

al Qaeda and the Taliban, (ii) whether that authority encompassed detention of U.S. citizen enemy combatants, and (iii) whether such detention could last for the duration of the war, even though the war might last for decades.

Justice O'Connor's plurality opinion first answered the threshold question whether the AUMF authorized detention. It pointed out that detention is a "fundamental incident of waging war" and, for that reason, is "clearly and unmistakably authorized" by the AUMF's grant of authority to employ "necessary and appropriate" military force. 542 U.S. at 519 (plurality opinion of O'Connor, J.). That point was, of course, fairly obvious: At its core, war consists of killing, capturing, and detaining the enemy. In any event, in reaching that conclusion, the plurality "looked to prior Executive Branch practice during wartime to inform its interpretation" of the AUMF. Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2085. The plurality also pointed to some international law-of-war sources as evidence that the "universal agreement and practice" among civilized nations supported the conclusion that detention was a fundamental incident of warfare. *Hamdi*, 542 U.S. at 518 (plurality opinion of O'Connor, J.) (quoting *Ex parte Quirin*, 317 U.S. 1, 30 (1942)).

Next, the Court found that the AUMF's authorization of detention encompassed detention of enemy combatants who were U.S. citizens. The Court noted that the United States had detained U.S. citizens as enemy combatants in the past, including during World War II. The Court also recognized that "such a citizen, if released, would pose the same threat of returning to the front during the ongoing conflict" as a non-citizen detainee. *Id.* at 519.

Finally, the Court addressed Hamdi's concern about "indefinite or perpetual detention" in light of the expected duration of the war against al Qaeda and the Taliban. *Id.* at 521. Hamdi in essence argued that there must be some implied limit to the duration of the President's authority under the AUMF, lest Hamdi spend the rest of his life in detention. In rejecting that contention, the plurality opinion initially noted that indefinite detention simply "for the purpose of interrogation" was not authorized by the AUMF; in other words, the Court stated the uncontroversial proposition that detention under the AUMF must be linked to the ongoing war. *Id.* More to the point, the plurality opinion stated: "[W]e understand Congress' grant of authority for the use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles." *Id.* By this statement, the plurality rebuffed Hamdi's duration-based argument and ruled that the President could detain Hamdi for the duration of the hostilities, even if the hostilities lasted for the rest of Hamdi's life. Insofar as the "duration of the relevant conflict" language in Justice O'Connor's opinion implicitly suggested a limitation on the President's detention authority under the AUMF, that limitation was of course commonsensical: A congressional authorization for the use of force obviously pertains to the war for which force is authorized and applies until Congress or the Commander in Chief ends the war.[22]

---

[22] In *Hamdi*, the Court separately held that a U.S. citizen detainee was entitled under the U.S. Constitution's Due Process Clause to a meaningful hearing before a neutral decisionmaker. *See* 542 U.S. at 509 (plurality opinion of O'Connor, J.); *id.* at 553 (Souter, J., concurring in part, dissenting in part, and concurring in judgment). That aspect of *Hamdi* exemplifies a point made repeatedly in this opinion: Courts enforce judicially manageable limits imposed by the U.S. Constitution on the President's war

The question here is how to interpret *Hamdi*'s isolated references to international law. They can be read in one of two basic ways. On the one hand, they can be read more narrowly as a direct response to Hamdi's argument that the AUMF did not authorize detention, and especially not indefinite or perpetual detention. A simple response to Hamdi's contention was that the AUMF authorizes the President to employ, at a minimum, those tools and methods that are traditional and "fundamental incident[s] of waging war," and the international laws of war may be one potential indication that a longstanding Executive practice falls within that category. As a practical matter, it would be quite odd to think that Congress, when passing the AUMF, did not intend to authorize at least what the international laws of war permit, subject of course to separate prohibitions found in domestic U.S. law. In that sense, international law can be said to inform judicial interpretation of the AUMF.

On the other hand, *Hamdi* is read far more broadly by Al-Bihani and amici to mean that international law conclusively defines the limits of the President's war powers under the AUMF. On this view, the authority granted to the President by the AUMF is coextensive with the international laws of war.

*Hamdi* should not be read so broadly. Justice O'Connor's plurality opinion in *Hamdi* carefully avoided stating that any action contrary to international-law norms would *not* be authorized under the AUMF. Nowhere did the Court say something like: "The limits of the President's authority under the AUMF are defined by the limits of

---

powers. *See also Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008).

international law." Nowhere did the Court say anything such as: "To the extent the AUMF is ambiguous, we interpret that ambiguity consistently with international law." Nowhere did the Court cite *Charming Betsy*. Nowhere did the Court consider the principles of interpretation it has traditionally applied in national security cases such as *Egan*, *Haig v. Agee*, *Dames & Moore*, *Youngstown*, and *Curtiss-Wright*. One would expect to find careful analysis of those principles in the *Hamdi* opinion if Al-Bihani's broader reading were correct. Here, as elsewhere, the dog that didn't bark is telling.[23]

To be sure, there is some ambiguity in *Hamdi*, which makes it difficult to know for sure what the plurality meant. As others have noted, the *Hamdi* plurality "did not explain how or why [the international laws of war] were relevant." Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2088. But there is good reason to adopt the narrower rather than the broader interpretation. It would have been momentous and historic for the Court to have held that the President's authority under the AUMF is coextensive with

---

[23] I do not agree, therefore, with the inference drawn by Professors Bradley and Goldsmith – and adopted by Judge Williams – that if "the international laws of war can inform the powers that Congress has implicitly granted to the President in the AUMF, they logically can inform the boundaries of such powers." Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2094. That conclusion about international law setting "the boundaries" of the President's authority would, in my view, require some evidence of congressional intent to that effect, some consideration of *Charming Betsy*, some analysis of why international law trumps the President in resolving statutory ambiguities, and some analysis of how that conclusion can be squared with the familiar principles of judicial restraint in the national security arena articulated in cases such as *Egan*, *Haig v. Agee*, *Dames & Moore*, *Youngstown*, and *Curtiss-Wright*.

international law.  After all, such a holding would mean that every general congressional authorization for war simultaneously incorporates judicially enforceable limits based on sometimes vague, contested, or still-evolving international-law norms that Congress itself has not expressly enacted into law.  (To take one current example, such a reading of *Hamdi* might mean that the President's ordering of U.S. drone attacks exceeds the President's authority under the AUMF.  *See supra* n.21.)  It is difficult to imagine that the Supreme Court would issue such an extraordinary ruling without careful consideration and extensive discussion of competing arguments.  Yet the question was not even briefed by the parties or debated at oral argument, much less analyzed by the plurality opinion.  And as I have explained, the Court never articulated a remotely clear statement along the lines that Al-Bihani now claims to locate in *Hamdi*.  Just as we assume Congress does not hide elephants in mouseholes, *see Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001), we can safely assume the Supreme Court does not do so either.  In short, I would not interpret *Hamdi* to have issued such a major pronouncement *sub silentio* or by indirection.[24]

In sum, *Hamdi* is not properly read as applying *Charming Betsy* or imposing international-law limits on the scope of the President's authority under the AUMF.

F

In this opinion, I have several times reiterated a key point: To the extent permitted by the Constitution and federal

---

[24] Judge Williams also suggests that *Boumediene* supports judicial invocation of international law as a limit on the Executive. I find nothing in *Boumediene* to support that proposition or that speaks to the role of international law in defining the limits of the AUMF.

statutes, the Executive is free to follow international-law principles as a matter of policy and to conduct its activities in accordance with international law. The Executive is also free to adopt legally binding regulations pursuant to statutory authorization and may, within the bounds permitted by statute, seek to correspond those regulations to international-law principles. A variety of Executive regulations and Army Field Manuals seek to ensure that the military acts consistently with certain international-law norms.

But here, we are simply analyzing the contours of a federal statute, the AUMF, and assessing whether that statute silently incorporates international law as a limit on the President's authority. In considering that issue, an interesting question arises: Do we give any legal weight to the Executive's view on that interpretive matter? The short answer is no: The Executive Branch's stance on whether *Charming Betsy* applies here (and whether the AUMF implicitly incorporates international law) is worth examining only for its persuasive value; it is not entitled to any legal weight. The Judiciary has the final word on the appropriate canons of construction or interpretive principles that courts are to employ in construing statutes.

When interpreting a statute, a court ascertains what the statute means by looking at the text and employing various interpretive principles and canons of statutory construction. If after applying those principles and canons, the court determines the statute is ambiguous or contains a gap to be filled, the court determines (sometimes implicitly) the range of reasonable interpretations of the statute. And then – in situations where deference to the Executive is considered appropriate, such as cases implicating national security – the court defers to the Executive's authoritative interpretation of the statute if the Executive's interpretation falls within that

zone of reasonableness.  *See Chevron*, 467 U.S. at 842-45; *cf. Egan*, 484 U.S. at 530.  But a gap or ambiguity in a statute does not relieve a court of its prior duty to interpret the statute in order to "define the boundaries of the zone of indeterminacy" in which the Executive is authorized to act. Michael Herz, *Deference Running Riot: Separating Interpretation and Lawmaking Under* Chevron, 6 ADMIN. L.J. AM. U. 187, 199 (1992).  And in performing that duty, the Court does *not* defer to the Executive on the question of what principles or canons of statutory construction to apply or how to apply them.  *See, e.g.*, *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 168-70 & n.5 (2001) (taking a different view from the Corps as to the value of subsequent legislative history in statutory interpretation).

If the Executive says that legislative history should (or should not) be considered, that the canon of constitutional avoidance should (or should not) be invoked, or that the presumption against implied repeals should (or should not) be applied, courts don't simply follow behind the Executive in lockstep.  Courts exercise their own independent judgment on those canons and interpretive principles.[25]  The same is true with respect to the *Charming Betsy* canon.

---

[25] Indeed, on numerous occasions the Supreme Court has invoked canons of statutory construction as "part of the plain meaning inquiry" to determine that the Executive's interpretation of a statute fell outside of the zone of statutory ambiguity.  WILLIAM N. ESKRIDGE, JR. ET AL., CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 1257-58 (4th ed. 2007); *see, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-75 (1988) (rejecting agency's interpretation as contrary to the canon of constitutional avoidance).  If the Court instead allowed *the agency* to dictate which canons apply, the Court would not be able to

Take an example. Assume arguendo that the AUMF is ambiguous as to whether it authorizes targeted killing of al Qaeda members whose conduct does not rise to the level of "direct participation in hostilities." If so, the Executive, motivated by international-law concerns, may choose to interpret the AUMF either to authorize or not to authorize targeted killing of al Qaeda members who are not direct participants in hostilities. *Cf.* Kristen E. Eichensehr, *On Target? The Israeli Supreme Court and the Expansion of Targeted Killings*, 116 YALE L.J. 1873 (2007). And in a justiciable case, courts will defer to that reasonable Executive interpretation – at least unless it contravenes another statute. But that is quite different from the Executive telling the court what canons of construction the court must employ in defining what the AUMF authorizes and permits in the first place.

Having explained that the Executive Branch's views on the applicability of the *Charming Betsy* canon matter only for their persuasive weight, the next question is: What in fact are the Executive's views on the *Charming Betsy* canon as applied to a statute like the AUMF? At the moment, that is unclear.

The Executive – speaking through the Office of Legal Counsel – has long maintained that the *Charming Betsy* canon is "wholly inapposite" to the interpretation of "broad authorizing statutes" like the AUMF that "'carry[] into Execution' core Executive powers." 13 Op. Off. Legal Counsel 163, 172 (1989) (quoting U.S. CONST. art. I, § 8, cl. 18). The Executive has declared that in the absence of

perform its role in defining the boundaries of permissible agency interpretation.

express congressionally imposed limitations, "general enabling statutes" of that kind should be presumed to grant authority "commensurate with" the President's constitutional powers. *Id.* And, the Executive has stated, that presumption "is all the more compelling where . . . the President's foreign relations powers are implicated." *Id.*; *see also* Bradley, Chevron *Deference*, 86 VA. L. REV. at 699 (discussing and endorsing the Executive Branch's analysis).

The Executive – speaking through the Solicitor General – has also repeatedly reiterated that position about *Charming Betsy* in litigation before the Supreme Court. *See* Gov't Br. at 36 n.11, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (No. 05-184) ("this Court has never applied the *Charming Betsy* canon to invalidate a presidential action that was taken in express reliance on a federal statute and involves the exercise of the President's core authority as Commander in Chief"); Reply Brief for the United States at 3, *Sosa*, 542 U.S. 692 (No. 03-485) ("the canon does not apply to a statute . . . that authorizes conduct by the branch of government most directly responsible for the conduct of foreign affairs and involves a core power of the Executive Branch").

In its brief in opposition to Al-Bihani's rehearing petition, the Executive Branch does not refer to the prior Executive Branch position. And it's unclear from its brief where the Government currently stands on this question. In the text of its brief, the Government says that international law "inform[s]" interpretation of the AUMF and that this view is "consistent with" *Charming Betsy*. Gov't Response to Pet. for Reh'g and Reh'g En Banc at 7. Notably, however, the Government's brief does not say that international law *limits* the AUMF or that *Charming Betsy applies* to the AUMF. Moreover, footnote 3 of the Government's brief states that "[w]here the laws of war are unclear or analogies to

traditional international armed conflicts are inapt, a court should accord substantial deference to the political branches in construing how the laws of war apply to this nontraditional conflict." *Id.* at 8 n.3. In light of the uncertainty surrounding many international-law norms, and given the numerous ways in which the current U.S. war against al Qaeda and the Taliban diverges from the traditional model of international armed conflict, courts following the approach suggested in footnote 3 of the Government's brief would routinely defer to the Executive's decision whether and how international law applies. The Government's position in footnote 3 is therefore entirely inconsistent with the understanding of the *Charming Betsy* canon advanced, for example, in the brief of the amici. Whatever the text of the Government's brief may appear to give, footnote 3 takes away. The Government's brief thus seems to erect a Potemkin *Charming Betsy* and to represent only a cosmetic change from the prior Executive Branch position on how *Charming Betsy* applies.

Insofar as the Government actually takes the position that courts must enforce international-law limits on the President's authority under the AUMF, that position prompts an observation: If the Executive wants to comply with international-law norms and believes it is detaining someone in violation of international law, it can simply release that person (at least to another country). *See, e.g.*, *Munaf v. Geren*, 128 S. Ct. 2207 (2008); *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009). No court has forced or is forcing the Executive to hold these detainees. The courts are simply ruling on whether the Executive is *authorized* under U.S. law to hold the detainees.

In short, it is not evident that the Executive Branch's currently articulated position on *Charming Betsy* differs from

its longstanding position. In any event, its position receives no special deference, so we need not decipher it further.[26]

---

[26] In considering the views of the Executive on legal questions affecting government power, courts must exercise care that the concessions of one Executive do not inappropriately bind future Executives. In court, the Executive Branch does not always press the most expansive possible argument in support of its legal authority – whether for reasons of policy, politics, litigation strategy, international concern, or otherwise. Courts must be careful before enshrining such concessions into binding judicial precedent protected by stare decisis that a future Executive could not readily undo. As the Supreme Court recently explained in a different context: "Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment. The President can always choose to restrain himself . . . . He cannot, however, choose to bind his successors by diminishing their powers, nor can he escape responsibility for his choices by pretending that they are not his own." *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010) (citations and internal quotation marks omitted).

Rather than accepting concessions, the Supreme Court on occasion has found that the law (either constitutional or statutory) is more favorable to the Executive than the Executive itself asserted in litigating the particular case. *See, e.g.*, *Free Enterprise Fund*, 130 S. Ct. 3138; *Davis v. United States*, 512 U.S. 452, 461-62 (1994) (declining to adopt a rule "requiring officers to ask clarifying questions" when a suspect makes an "ambiguous or equivocal" request for counsel, although the Government had argued in its brief that such a rule would be appropriate); *Freytag v. Comm'r*, 501 U.S. 868, 879-80 (1991) (declining to "defer to the Executive Branch's decision" that statute allowing Chief Judge of Tax Court to appoint trial judges did not encroach upon "Presidential prerogatives under the Appointments Clause"); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 491 (1977) (Blackmun, J., concurring in part and concurring in judgment) ("incumbent

### III

Suppose that the above analysis of *Hamdi* or *Charming Betsy* is wrong and that the President's authority under the AUMF is in fact limited by international law. It nonetheless would not follow that the President would be subject to judicially enforceable international-law limits when commanding the U.S. war effort and detaining captives such as Al-Bihani. That is because the President possesses independent authority under Article II of the Constitution to act against al Qaeda and the Taliban – and to detain members of those groups – even without congressional authorization. Article II constitutes an alternative source of authority that the *Hamdi* Court did not need to – and did not – consider. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 517 (2004) (plurality opinion of O'Connor, J.) ("We do not reach the question whether Article II provides such authority . . . because . . . Congress has in fact authorized Hamdi's detention, through the AUMF.").

To appreciate that Article II point, it is useful to recount the framework for judicial review of presidential actions in the national security and foreign policy arena set forth by Justice Jackson in his landmark opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *see also Medellín v. Texas*, 552 U.S. 491, 524-25 (2008) (applying framework); *Dames & Moore v. Regan*, 453 U.S. 654, 668-69 (1981) (same). According to Justice Jackson, presidential

---

President's submission, made through the Solicitor General, that the Act serves rather than hinders the Chief Executive's Art. II functions" is not "*dispositive* of the separation-of-powers issue"); *id.* at 556-57 (Rehnquist, J., dissenting) ("the principle of separation of powers . . . . may not be signed away by the temporary incumbent of the office which it was designed to protect").

actions can be divided into three categories, each with different constitutional implications:

- In Category One, the President acts pursuant to a congressional authorization, and his authority is therefore "at its maximum." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Courts will uphold a presidential action in Category One so long as that action is within the power of the federal government as a whole. *Id.* at 636-37.

- In Category Two, the President acts in the absence of "either a congressional grant or denial of authority." *Id.* at 637. A presidential action that falls in Category Two is not affirmatively authorized by Congress, but neither is it prohibited. The President is therefore operating in what Justice Jackson called a "zone of twilight." *Id.*

- In Category Three, the President acts in contravention of the will of Congress, and his authority is therefore "at its lowest ebb." *Id.* Courts will strike down a presidential action in Category Three unless the Constitution gives the President exclusive, preclusive authority to take the challenged action. *Id.* at 637-38; *see* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 693-94 (2008).

In this case, the President's exercise of detention authority pursuant to the AUMF is properly understood as falling within Category One of Justice Jackson's *Youngstown* framework, regardless of whether the President has exercised that authority in compliance with international law. The

AUMF broadly authorizes the President to use military force against al Qaeda and the Taliban. "Force" includes at least all the traditional and fundamental tools of warfare, including detention of enemy personnel. That grant of authority also affords the President discretion to reasonably define the class of enemy personnel subject to military detention. *Cf. Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727-28 (2010) (courts defer to factual inferences drawn by the Executive "in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess"). Neither the AUMF's text nor its legislative history suggests that Congress intended to authorize the President to take only those actions approved by international law; and that silence is instructive given that, as the Supreme Court has recognized, "Congress knows how to accord domestic effect to international obligations when it desires such a result." *Medellín*, 552 U.S. at 522.

But if that is incorrect and if, as Al-Bihani and amici contend, the AUMF does *not* authorize the President to take actions that are prohibited by international law, then presidential actions contrary to international law would lack congressional authorization. Therefore, such actions would not fall within Justice Jackson's Category One.

But even so, it is important to appreciate that such actions then would merely fall into Category Two of Justice Jackson's *Youngstown* framework, not Category Three. The AUMF certainly does not *prohibit* the President from violating international law, such that doing so would make this a Category Three situation. As Professors Bradley and Goldsmith have correctly explained, the AUMF "is a broadly worded authorizing statute; it does not purport to prohibit the President from doing anything, much less from violating the

laws of war." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 HARV. L. REV. 2047, 2097 (2005).

Therefore, if Al-Bihani and amici are correct in their reading of *Hamdi* or *Charming Betsy*, then presidential actions contrary to international law are neither authorized nor prohibited by the AUMF – and as a result would fall within the "twilight" of Justice Jackson's Category Two.

The proper Category Two analysis in these circumstances supports the President. Courts generally will not circumscribe the President's authority to take action in defense of the Nation – at least action against non-citizens abroad – "unless Congress specifically has provided otherwise" or the action contravenes other constitutional limits. *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988); *see also The Prize Cases*, 67 U.S. 635, 668 (1862) ("If a war be made by invasion of a foreign nation, the President . . . . is bound to accept the challenge without waiting for any special legislative authority."). As Justice Jackson stated in *Youngstown*, courts should "indulge the widest latitude of interpretation to sustain [the Commander in Chief's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society." 343 U.S. at 645 (Jackson, J., concurring); *cf. Dames & Moore*, 453 U.S. at 686 ("a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II") (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).[27]

---

[27] Here, as in any Category Two situation, it is important to reiterate that Congress has the power to move the case to Category

To be sure, in *domestic* administrative law, with a few constitutionally based exceptions, the Executive is generally barred from taking action that is not within the scope of an affirmative congressional authorization. But when the President acts extraterritorially against non-U.S. citizens in self-defense of the Nation, especially in support of a war effort that Congress has authorized, that default assumption is reversed. In that realm, the President possesses broad authority under Article II, as Chief Executive of the Nation and Commander in Chief of the Armed Forces, that does not depend on specific congressional authorization.

There are many examples in recent years of Presidents' invoking their Article II authority to act without specific congressional authorization in the national security realm. In 1995, President Clinton deployed troops to Bosnia without congressional authorization, citing only his independent Article II authority "as Commander in Chief and Chief Executive." President Clinton again acted without congressional authorization when he ordered air strikes in Kosovo in 1999. Similarly, President George W. Bush invoked only his Article II authority when he deployed U.S. military forces to Haiti without congressional authorization in 2004. *See* Letter to Congressional Leaders on the Deployment of United States Military Forces for Implementation of the Balkan Peace Process, 2 PUB. PAPERS OF WILLIAM J. CLINTON 1856-57 (Dec. 6, 1995); Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia

Three by prohibiting or limiting the presidential action in question. In other words, any conclusion about the President's authority in Category Two does *not* disable Congress from legislating on the issue in question, and thereby restricting the President's authority, to the extent permitted by the Constitution.

and Montenegro), 1 PUB. PAPERS OF WILLIAM J. CLINTON 459-60 (Mar. 26, 1999); Letter to Congressional Leaders on the Further Deployment of United States Military Forces in Haiti, 1 PUB. PAPERS OF GEORGE W. BUSH 295-96 (Mar. 2, 2004).[28]

---

[28] Under Article II, the President possesses significant authority to act without congressional authorization in the national security and foreign policy realms (that is, to act in *Youngstown* Category Two). At least in its basic outlines, that proposition is generally accepted.

Although not directly relevant to the discussion here, it bears mention for purposes of analytical clarity that the President also has some lesser authority – albeit largely undefined – to act not only without congressional authorization but also over a congressional prohibition (that is, to act in *Youngstown* Category Three). This is known as the President's exclusive, preclusive authority. The precise scope of that authority is highly controversial and is, as Justice Jackson rightly explained, a sensitive and weighty question. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see also* Barron & Lederman, *The Commander in Chief at the Lowest Ebb – Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. at 693-94.

As scholars have catalogued, Presidents throughout history have often asserted power in Category Two and on occasion even in Category Three. *See* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb – A Constitutional History*, 121 HARV. L. REV. 941, 1098 (2008) (from 1950 through 2008, "every President, save for Carter, invoked" exclusive, preclusive executive war powers "in one form or another"); JOHN YOO, CRISIS AND COMMAND: A HISTORY OF EXECUTIVE POWER FROM GEORGE WASHINGTON TO GEORGE W. BUSH 402 (2009) (Presidents "have often wielded their powers in the face of congressional silence, and sometimes they have acted contrary to Congress to advance what they perceived to be the national interest"); *see, e.g.*, Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS OF WILLIAM J. CLINTON 1464 (Aug. 21, 1998)

For purposes of considering the President's power to detain suspected members of al Qaeda or the Taliban even without congressional authorization (that is, in Category Two), perhaps the most relevant historical precedent is President Clinton's bombing of suspected al Qaeda targets in Afghanistan and Sudan in 1998. In ordering those military strikes, President Clinton relied solely on his Article II authority. *See* Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS OF WILLIAM J. CLINTON 1464 (Aug. 21, 1998). President Clinton thus took action without congressional authorization to *kill* non-U.S.-citizens abroad whom he determined to be members or facilitators of al Qaeda; that action certainly suggests that the President possesses at least some lesser included authority under Article II to *detain* such individuals without congressional authorization.[29]

---

(asserting constitutional authority to order military strikes against terrorists abroad in the absence of congressional authority, that is, in Category Two); U.S. DEPARTMENT OF JUSTICE, LEGAL AUTHORITIES SUPPORTING THE ACTIVITIES OF THE NATIONAL SECURITY AGENCY DESCRIBED BY THE PRESIDENT 3, 34-35 (2006) (asserting in the alternative that the President possesses constitutional authority to order the NSA to intercept certain terrorist communications even in the face of a congressional prohibition, in other words, that such presidential power is exclusive and preclusive and that the President prevails in Category Three); *see also In re Sealed Case*, 310 F.3d 717, 742 (FISA Ct. Rev. 2002) ("We take for granted that" Congress "could not encroach on the President's constitutional power" to "conduct warrantless searches to obtain foreign intelligence information" – in other words, that such presidential power is exclusive and preclusive and that the President prevails in Category Three).

[29] This analysis of *Youngstown* Category Two does not mean the President has the authority to initiate, for example, a large-scale

In exercising his Article II Commander-in-Chief authority, the President is not subject to judicially enforceable *international-law* limitations. Nowhere does the Constitution require the President to comply with foreign or international law. "[U]nder our Constitutional jurisprudence," an "action by the President . . . that is within [his] constitutional authority does not become a violation of the Constitution because the Act places the United States in violation of a treaty provision or of a U.S. obligation under customary law." LOUIS HENKIN, FOREIGN AFFAIRS AND THE UNITED STATES CONSTITUTION 236 (2d ed. 1996). And in its recent decision in *Medellín*, the Supreme Court decisively held that the President's "responsibility to 'take Care that the Laws be faithfully executed'" applies only to "domestic law." 552 U.S. at 532 (quoting U.S. CONST. art. II, § 3). There is no basis, moreover, for thinking that international-law norms independently equate to congressional prohibitions for purposes of putting a presidential action in Category Three. In his comprehensive *Youngstown* opinion, Justice Jackson

---

offensive ground war without congressional authorization. The initiation of war – particularly an offensive ground war where American casualties are likely to be significant – arguably presents a constitutional question different in kind because the Constitution specifically assigns to Congress the power to declare war. *See* U.S. CONST. art. I, § 8, cl. 11; THE FEDERALIST NO. 69, at 416 (Alexander Hamilton) (Clinton Rossiter ed., rev. ed. 1999); Letter from George Washington to William Moultrie (Aug. 28, 1793). For present purposes, it is enough to point out that, even without specific congressional authorization, the President has constitutional authority to take steps against non-citizens abroad to support a congressionally authorized war or to take shorter-term actions against non-citizens abroad in order to protect the Nation, at least unless the Constitution or a constitutionally permissible federal statute prohibits the action in question.

never suggested that courts should constrain the President's exercise of war powers based on international law. Not surprisingly, therefore, "[t]he Supreme Court has never invalidated presidential action on the ground that the action violated the laws of war." Bradley & Goldsmith, *Congressional Authorization*, 118 HARV. L. REV. at 2097 n.220. Indeed, "[i]f the Commander in Chief Clause itself incorporates evolving law-of-war restrictions, the scope of the Commander-in-Chief power would have shrunk significantly during the past two centuries, which is contrary to constitutional history." *Id.*

Thus, even if the AUMF incorporates international-law limitations on the President's authority, Article II does not. In the final analysis, then, it ordinarily would make little difference whether the AUMF incorporates international-law norms as a limit on the scope of the President's statutory authorization, because Article II would still independently authorize the President's action. It *would* make a difference in this case, but only because the Executive Branch no longer is asserting Article II as a basis for detaining Al-Bihani and other Guantanamo detainees. Therefore, Al-Bihani and other Guantanamo detainees will prevail in litigation and win their release if the AUMF does not authorize their detention, even if Article II of the Constitution would authorize it.[30]

---

[30] President Bush and President Clinton asserted independent Article II authority to take action against al Qaeda. *See* Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 PUB. PAPERS OF WILLIAM J. CLINTON 1464 (explaining that President Clinton had ordered strikes against al Qaeda terrorist camps in Afghanistan "pursuant to my constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive"); Gov't Br. at 19, *Hamdi*, 542 U.S. 507 (No. 03-6696) (asserting that Article II authorized President Bush to wage war in response to the

* * *

In sum, courts enforce constitutionally permissible constraints imposed by Congress on the President's war powers, including those that Congress might derive from international-law principles. Courts likewise enforce judicially manageable constraints imposed by the U.S. Constitution on the President's war powers. In addition, the Executive Branch within its constitutional and statutory bounds may decide, as a matter of international obligation or policy, to follow non-self-executing treaties and customary-international-law norms. But all of that is far different from a court on its own invoking international-law principles to restrict the President's direction and management of the war effort. Under our Constitution, it is for the political branches in the first instance to incorporate international-law norms into domestic U.S. law. Congress did not do so when enacting the AUMF. In asking us to nonetheless rely on international-law principles to order Al-Bihani's release from U.S. military custody, the argument of Al-Bihani and amici contravenes bedrock tenets of judicial restraint and separation of powers.

---

September 11th attacks and detain enemy combatants in connection with that war without "any special legislative authority") (quoting *The Prize Cases*, 67 U.S. at 668). Even though the current Administration has chosen not to assert its Article II authority before the courts in these Guantanamo cases, it has not argued that the President does not possess detention authority under Article II, nor has it suggested that any such authority would be limited by international law.

WILLIAMS, *Senior Circuit Judge*: The only serious claim in appellant's petition for *en banc* review, a claim backed by amici non-governmental organizations and scholars, argues that the panel improperly failed to consider the possible impact of international law on the President's authority under the Authorization for the Use of Military Force, Pub.L. No. 107–40 § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note) (the "AUMF"). I made clear in my separate opinion why Al Bihani's detention was plainly lawful, so that it was unnecessary here to address in general terms the potential role of international law in such cases. *Al-Bihani v. Obama*, 590 F.3d 866, 885 (D.C. Cir. 2010). I continue to believe that that was correct, and for the same reasons. See also Opinion of Sentelle, C.J., and Ginsburg, Henderson, Rogers, Tatel, Garland and Griffith, JJ., concurring in denial of rehearing *en banc* ("[T]he panel's discussion of that question is not necessary to the disposition of the merits.").

In connection with the denial of rehearing, Judge Kavanaugh has filed an extensive scholarly analysis of whether international law, in the form of customary international law or non-self-executing treaties, can ever properly influence a United States court to find authority granted by statute to the President narrower than it otherwise would. I commend Judge Kavanaugh's exposition to all. While I agree with much of it, my disagreement on certain points seems worth stating.

I follow Judge Kavanaugh in distinguishing analytically between elements of international law embodied specifically in statutes or in self-executing treaties and elements in the form of customary international law or non-self-executing treaties. See Kavanaugh Op. at 8. It is only the latter that concern us here; I will for simplicity's sake refer to them as "international law" or some close approximation.

Judge Kavanaugh, I think, fails to adequately distinguish between treatment of international law norms as "judicially enforceable limits" on Presidential authority, *id*. at 1, or as "domestic U.S. law," *id*. at 8, and use of such norms as a "basis for courts to alter their interpretation of federal statutes," *id*. at 47. By "alter their interpretation," I take Judge Kavanaugh to mean (as I said above) for a court to allow international law to persuade it to adopt a *narrower* interpretation of the President's authority than it would otherwise have chosen. I will assume that Judge Kavanaugh is correct as to the impropriety of the stronger use of international law (treating it as "domestic law"), but I believe him incorrect on the weaker (allowing it to affect a court's statutory interpretation).

Courts use a wide range of information outside the words of a statute to find those words' meaning. This reflects the simple truth that the question of a word's meaning is an empirical one: what have persons in the relevant community actually meant when using the words that appear in a statute? Among the most obvious outside sources to resolve that question are legislative history, usage in other laws and in judicial decisions, and dictionaries. Courts use all three incessantly. Dictionaries, of course, are only scholars' claims as to how people have historically used the words in question. Because military conflict is commonly an international phenomenon, words relating to such conflict are used in international discourse, of which international law is a subset. That international law has a normative element is nothing special; virtually all laws do—yet laws represent widely known public uses of language that legislatures often repackage in novel combinations and contexts. It would be an odd member of Congress who supposed that in authorizing the use of military force he was embracing uses equivalent to *all* such uses that have ever occurred: think Nanking 1937-38;

Katyn 1940; Lidice 1942; My Lai 1968. More generally, it seems improbable that in authorizing the use of all "necessary and appropriate force" Congress could have contemplated employment of methods clearly and unequivocally condemned by international law.

Judge Kavanaugh agrees with that conclusion, but argues that we infer such limits on Congress's grant of power simply from penalties or prohibitions in *domestic* law. See *id*. at 44-45. He is surely correct that this is *one* source for finding limits on an authorization of military force, but that does not make it the only legitimate source of such limits. In some circumstances, Judge Kavanaugh's "domestic U.S. law of war," *id*. at 43 n.14, may have relatively little to say on a question that international practice has addressed for centuries. It obviously seemed so to the Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-21 (2004), where the plurality looked to international norms on the question of whom the President may detain pursuant to the AUMF, and for how long.

Before *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), U.S. courts undoubtedly used international law to help resolve cases. See Kavanaugh Op. at 16. It appears to have been uncontroversial for international law to serve not only as a species of federal general common law, binding absent contrary domestic law, see *id*. at 16-17, but also as a source of interpretive guidance regarding statutes passed by Congress, see, e.g., *Brown v. United States*, 8 Cranch 110, 124-28 (1814) (Marshall, C.J.) (interpreting the domestic legal effects of a U.S. declaration of war in part by reference to international norms, along with constitutional principles and domestic statutes). To dispute that commonsensical understanding, after all, requires defending the unlikely view that international law—unlike other known binding laws—

offered no useful information whatsoever regarding the meaning of new laws on similar subjects. In Judge Kavanaugh's view, *Erie* effectively proscribed use of international law as "enforceable" U.S. law. See Kavanaugh Op. at 17. But that landmark case left intact the pre-existing alternative role of international law as a store of information regarding the sense of words Congress enacts into laws governing international matters—a role that never depended on international law's being a form of federal general common law (which *Erie* famously banished). *Erie* hardly requires that every last source of information regarding the meaning of words in statutes be an enacted law; if it does, federal courts have been disobeying its command for more than seven decades.

Even Judge Kavanaugh appears to acknowledge that international law may in some circumstances properly shape a court's interpretation of a federal statute. If I understand him correctly, though, he accepts reliance on international law to *expand* the meaning of a statutory grant of executive authority but never to *contract* it (the benchmark being the reading the court would otherwise have reached). See Kavanaugh Op. at 69; *id*. at 70 n.23. Use of international law as a one-way ratchet seems to me illogical. As Curtis Bradley and Jack Goldsmith put it in *Congressional Authorization and the War on Terrorism*, if the international laws of war "can inform the powers that Congress has implicitly granted to the President in the AUMF, they logically can inform the boundaries of such powers." 118 Harv. L. Rev. 2047, 2094 (2005). To whatever extent the international laws of war shed light on what the AUMF lets the President do, they shed light in all directions, not just one. If international law supports finding a grant of the "X" power (a power that by hypothesis the court would not otherwise have found), it must support some inquiry into what "X" means.

The plurality's ruling in *Hamdi* uses international law as an interpretive tool in the way I've described. There the petitioner contended that the AUMF simply didn't authorize detention of U.S. citizens. Four justices of the Supreme Court agreed. 542 U.S. at 551 (Souter, J., concurring in part, dissenting in part) ("I conclude . . . that the Government has failed to support the position that the Force resolution authorizes the described detention of Hamdi[.]"); *id*. at 574 (Scalia, J., dissenting) ("Contrary to the plurality's view, I do not think this statute [the AUMF] even authorizes detention of a citizen[.]"). Four others disagreed, reasoning that the AUMF was a classic authorization for the use of force, and that incident to such authorizations, states almost invariably enjoy the right to detain certain captured individuals. But the plurality made *explicit* that the detention authority that is a standard tool for states authorized to use force is by no means unlimited: "Certainly, we agree that indefinite detention for the purpose of interrogation is not authorized. Further, we understand Congress' grant of authority for use of 'necessary and appropriate force' to include the authority to detain for the duration of the conflict, and our understanding is based on longstanding law-of-war principles." See *id*. at 521 (plurality opinion). Thus the plurality answered Hamdi's concern about indefinite duration by saying that the detention authority recognized under the law of war, and thus implicitly conferred by the AUMF, was subject to a *limit* similarly recognized by the law of war.

All of this said, I want to make clear that I agree with Judge Kavanaugh that the President's interpretation of such an authorizing statute is owed "great weight," the phrase I used in my separate opinion in *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005), *rev'd* 548 U.S. 557 (2006). I do not

see much if any daylight between "great weight" and the *Chevron* deference that Judge Kavanaugh invokes.[1]

Thus, when an Article III court is for some reason adjudicating the validity of executive military conduct (an issue to which I return below), and there is uncertainty as to whether the conduct fell within the statutory language, I would expect the court to ask what limits the statute *clearly* set on its grant of authority. In doing so the court would use all the traditional means of statutory interpretation to flesh out the statutory boundaries. See *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987). These would include historical uses of the terms in relevant contexts, including the discourse of

---

[1] The Obama administration's interpretation of the AUMF is that international law *does* illuminate the outer bounds of the authority conferred by the statute. See Resp. to Pet. for Rehearing at 6-7 ("[T]he panel's . . . statements that the laws of war do not limit the President's authority under the AUMF . . . do[] not properly reflect the state of the law."); Harold Hongju Koh, Legal Adviser, U.S. Department of State, The Obama Administration and International Law: Address at the Annual Meeting of the American Society of International Law (Mar. 25, 2010) (text available on the website of the U.S. Department of State at http://www.state.gov/s/l/releases/remarks/139119.htm) (last viewed Aug. 3, 2010) ("[T]his Administration has expressly acknowledged that international law informs the scope of our detention authority. Both in our internal decisions about specific Guantanamo detainees, and before the courts in habeas cases, we have interpreted the scope of detention authority authorized by Congress in the AUMF *as informed by the laws of war.*") (emphasis in original). While Judge Kavanaugh treats the government's view of the AUMF as a matter of *how* to interpret the statute (and therefore one within the discretion of the judiciary in the first instance), the Executive's position seems more accurately viewed as an interpretation of the statute in its own right (and thus worthy of our deference). Cf. Kavanaugh Op. at 72-77.

international law.  Only conduct beyond the words' clearly established meaning would be off-limits.

Moreover, I should not be taken as saying that courts should take uncertain or disputed propositions of international law and build them into iron constraints on the meaning of congressional grants of authority.  Judge Kavanaugh is quite right to quote Gouverneur Morris's observation that international law is "often too vague and deficient to be a rule" without implementing legislation.  Kavanaugh Op. at 9.  Courts should approach seemingly authoritative declarations of international law with caution.  Even the highest international tribunals appear at times to be influenced in their rulings by the favor in which the disputing nations are held in international circles.  Cf. H.R. Res. 713, 108th Cong. (2004) (denouncing the July 9, 2004 decision of the International Court of Justice in the Hague purporting to find Israel's construction of a barrier at the time of the Second Intifada a violation of international law).  Thus U.S. courts should not automatically attach weight to rulings of such tribunals, not to mention less authoritative expressions of international law, in the absence of clear reason to believe that they will be consistently and evenhandedly applied, are the product of serious reasoning and are susceptible of practical application.

Finally, Judge Kavanaugh is plainly concerned about the propriety of Article III courts using gauzy notions of international law to rein in the executive's conduct of military operations.  I share that concern.  But under *Boumediene*, Article III courts evaluate the propriety of the detention of non-U.S. nationals.  In doing so they necessarily pass judgment on the admissibility of evidence collected on the battlefield, and thus on the propriety of the methods used for such collection.  District courts have been doing so regularly since *Boumediene*.  They therefore monitor, and to a degree

supervise, the battlefield conduct of the U.S. military. But that is a consequence of *Boumediene*, in which the federal judiciary assumed an entirely new role in the nation's military operations; it is not a product of international law's role in understanding congressional grants of power—a separate matter entirely.